Hortencia **BOHEN**, Plaintiff,

v.

The **CITY OF EAST CHICAGO, INDIANA**, et al., Defendants.

Civ. No. H 83–0484.

United States District Court, N.D. Indiana, Hammond Division.

Sept. 11, 1985.

Milan D. Tesanovich, Portage, Ind., Ivan E. Bodensteiner, Linda D. Moskowitz, Valparaiso, Ind., for plaintiff.

Anthony DeBonis, Jr., Janet Bowermaster, Murphy, McAtee, Murphy, East Chicago, Ind., for defendants.

## OPINION

EASTERBROOK, Circuit Judge.*

Hortencia Bohen worked at the fire department of the City of East Chicago between December 3, 1979, and May 9, 1983. She was a dispatcher. Dispatchers usually work in teams of two on eight hour shifts. Each dispatcher works five shifts per week. Nine or ten dispatchers (the department's usual complement) can maintain 24 hour service while permitting vacations and time off.

Dispatchers receive calls about fires and medical emergencies. They must know the nature of the building at almost every address in East Chicago in order to know what equipment to send to a fire, and they also must know the function and location of all of the department's equipment. The job calls for knowledge and the ability to remain calm under stress. Knowledge and a prompt, calm response may save lives.

Bohen, whose national origin is Mexican, complained in 1982 to the Equal Employment Opportunity Commission that the de-

---

* Of the Seventh Circuit, sitting by designation.

partment had discriminated against her on account of her sex and national origin. She protested harassment by Solomon Ard, the Fire Chief, and discrimination in the administration of discipline. According to the charge, both white and black dispatchers had escaped discipline for events that, when committed by Bohen, had led to admonitions. Before the EEOC could make a preliminary determination, Bohen asked for and received a letter giving her the right to sue. The letter was dated May 9, 1983. Bohen received another, less welcome, letter dated May 9. This one was from James Dawson, Deputy Chief in charge of personnel. Dawson's letter fired Bohen, explaining: "We have tried to be as tolerant as possible of your irrational actions. Your behavior has gotten to the point where good order and discipline on the Department has been jeopardized. Some of the problems that you have created have been manifested in other areas of the Department. We in the Fire Administration have come to the conclusion that a person of your character would be counter productive to good order, discipline and security."

Bohen makes three claims: first, that she was the victim of sexual harassment and assault at the department, which she says violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, and the fourteenth amendment to the constitution, for which 42 U.S.C. § 1983 supplies the remedy; second, that she was fired in retaliation for filing a complaint with the EEOC, which she maintains violated Title VII, the first and fourteenth amendments, and 42 U.S.C. § 1981; third, that she would not have been fired but for her sex and national origin, which she says violated Title VII and both the thirteenth and fourteenth amendments. A bench trial was held on August 16, 19, and 20, 1985. This opinion contains the findings and conclusions required by Fed.R.Civ.P. 52(a).

The evidence demonstrates that Bohen was the victim of sexual harassment on the job, but that she was fired for obstreperous and insubordinate conduct. The charge filed with the EEOC, her sex, and her national origin did not cause or contribute to the discharge. Because she was not disciplined or discharged for resisting the sexual advances or protesting the sexually offensive speech, she cannot establish any entitlement to back pay or reinstatement; because the fourteenth amendment does not independently prohibit sexual advances and innuendo, and the remedies under Title VII are limited to back pay, reinstatement, and similar equitable relief, the defendants are entitled to judgment.

I

Dispatchers usually work in pairs. They sit at a small console in the communications room of the main fire station. The console contains telephones, radios and other equipment for dispatching fire trucks and medical teams and for communicating with the men in the field. ("Men" here is not global for "people." The department has never had a female firefighter.) The room also contains two tape recorders, one making a permanent record of all conversations on the telephones and the other usually set to record but also available to replay any recent conversation. The dispatchers must sit close together while working.

The communications room adjoins the apparatus floor of the main fire station. On the other side of the apparatus floor is the administrative wing, with offices for the fire chief, deputy and assistant chiefs, and staff, and space for training. The firefighters work 24-hour shifts (one day on, two days off) and live above the apparatus floor. The communications room contains a small lounge with chairs, TV, and a coffee pot. The ranking administrators of the department (including fire captains) sometimes congregate in this lounge, although they are not supposed to do so; on occasion active firefighters also visit the lounge.

Shortly after joining the department, Bohen was assigned to work the shift from 11:00 p.m. to 7:00 a.m. with Joseph Creviston, who had been a firefighter from 1950 to 1971 and had been rehired as a dispatcher in 1978 by Robert Pastrick, the Mayor of East Chicago. Creviston was then the sen-

ior dispatcher. From July 1980 until the middle of 1982 Creviston was the Head Dispatcher, the supervisor of all dispatchers. (He was replaced as Head Dispatcher in 1982 by Cyrus Horvath, a former firefighter who became a dispatcher after being injured.) Bohen testified that on the first night she worked with Creviston she took a short nap and awoke at 4:00 a.m. to find Creviston's hands pressed against her crotch. She rebuffed him; he invited her out for a drink; she reported the incident to an assistant chief.

According to Bohen sexual incidents with Creviston "went on and on" as the two worked the graveyard shift until July 1980. Creviston would spread his legs while sitting at the console so that Bohen could not move without touching him. When Creviston was standing, he would rub his pelvis against her rear. He insisted that she not close the door of the bathroom when using it. (A bend in the hall prevents someone at the console from seeing into the bathroom even when the door is open.) Once she had to fight Creviston off with a clipboard while trying to dispatch some equipment to a fire. When Creviston spoke to her, the talk was entirely about sexual matters—in what positions he liked to have sexual relations, how Bohen should comport herself, and so on.

The worst passed with the end of their joint shift. But sex was on the mind of those who visited the lounge in the communications room during the day, and according to Bohen the conversation there was exceptionally vulgar, with conversations about sexual positions and practices dominating all else, even food and the weather. On one occasion, Bohen reports, one of the visitors (Captain Bianci) told Bohen that she needed someone "to drag her into the bushes for a good fuck." This implied threat of rape may have been related to a rumor spread by some senior officers of the department that Bohen was a lesbian—a charge that led to her nervous exhaustion and to a stay of several days in a hospital.

Bohen testified that she repeatedly complained to senior officers of the department about the sexual harassment. Some of the complaints were made to Michael Jancek, then an Acting Deputy Chief, while Bohen and Jancek were dating for a few months in 1980. A memorandum from Bohen to Chief Ard, dated January 6, 1981, complains that Creviston "continues to make advances at me," protests the order to keep the bathroom door open, and reports episodes of rubbing. According to Bohen the chief promised to discipline Creviston but did not. Bohen also testified that from time to time supervisors would ask if anything had been done or otherwise indicate knowledge of the problem. But nothing was done, and the department did not even have a written policy against sexual harassment until after Bohen had been fired. To the contrary, before she took the job, she was warned in an office interview with then-chief Paganelli that the firefighters were "kind of nasty" and would "try anything;" as a result, the chief informed her, she must not socialize with the men, must not enter the apparatus room, and must dress to cover herself from neck to toe. Sexual problems lay ahead, and the department put the entire burden on the female dispatchers.

Bohen's story depicts the communications room at the department as a den of lechery, of men verbalizing their fantasies when she would not yield physically. She reports that the atmosphere made the job unpleasant, that she became withdrawn, that she would take out her frustrations in pointless anger against her two children and her boyfriend, that she all but stopped talking with men on the job and off. She suffered humiliation, anguish, and the costs of two brief stays in the hospital.

The department in turn depicts Bohen as a liar. Almost every person who Bohen charged with sexual harassment—or with knowing about the problems she suffered—took the stand and denied both harassment and knowledge. Creviston denied making advances; two other female dispatchers (Adelle Herrera Granda and Constance Turner) denied that they had

been hassled or that Bohen had complained to them; Chief Ard, Deputy Chiefs Dawson, Podkul, and Melyon, and Assistant Chiefs Jancek and Rizzardo all denied knowledge of any harassment. They portrayed Bohen as a chronic complainer (the personnel files of other employees are indeed full of complaints filed against them by Bohen), a malcontent who could not accept criticism and who lashed out against all who crossed her.

 Bohen doubtless is a complainer, and as I explain below her outbursts and unsupported accusations against others were a sufficient cause of her discharge. There are, moreover, many other reasons to doubt her testimony. Her story has changed repeatedly. The charge filed with the EEOC does not mention sexual harassment. It mentions harassment by Chief Ard, but this pertains to an allegation of physical abuse.[1] Bohen testified at her deposition only to the incidents of rubbing; the offensive touching and the clipboard incident came out only at trial. Bohen conceded that she had lied to Jancek about her efforts to obtain a uniform (one of the events for which she received discipline), although she also tried to say the lie had been harmless.

Some of Bohen's testimony is simply incredible. For example, she testified that she had filed many complaints against Creviston because, she believed, he regularly came to work drunk. None of the personnel files at the department contained these complaints, Bohen asserted, because she had given them all to the EEOC, which had confiscated them. How she came to have the complaints, or why the EEOC would confiscate them (they did not show up in the EEOC's investigative file) remains a mystery. Bohen also gave a vivid description of her firing. She had been away from work and returned on Friday, May 13,

1983. When she arrived at work she was summoned to the administrative wing where the senior officers were assembled. One officer tossed a letter to her (the one telling her she was fired), while all laughed at her discomfort and Jancek proclaimed: "It's Friday the 13th, and don't you ever forget today." Yet at her deposition Bohen stated that she had learned of the discharge on Monday, May 9, and on cross-examination and redirect (as well as in an amendment to the deposition) Bohen changed the date of the meeting to Thursday, May 12. The vivid picture turned out to be an imagined one. A final example. Bohen asserted that during one confrontation Jancek injured her, causing a bruise that she showed a day or two later to Chief Ard when complaining about Jancek. But she also admitted that the event was at most an accidental touching with a pen in the course of signing a document. She did not explain how an accidental touch with a pen could cause a bruise, or why she would make a point of displaying the bruise to the fire chief. These and several more episodes, which I discuss below, cast substantial doubt on Bohen's willingness to tell the truth—or perhaps on her ability to separate truth from fiction in her own mind.

 Yet for all this I am convinced that Bohen was the victim of sexual harassment, just as she described it. Her testimony was strongly corroborated by Francine Rivera-Breger, now the assistant supervisor of dispatchers. Rivera-Breger joined the department in January 1979, and the defendants portray her as a model dispatcher—knowledgable, dedicated, cool under pressure, and very easy to work with. Her testimony was most impressive. She received the same initial warning from then-chief Paganelli. She recounted a harrowing series of encounters with Creviston during her initial (probationary) year.

---

1. The defendants have not argued that the omission of sexual harassment from the charge precludes this Title VII litigation, and because the omission is not "jurisdictional" it is not appropriate for me to resolve the case on that ground. Cf. *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.,* 538 F.2d 164 (7th Cir.) (en banc), cert. denied, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). Similarly, the defendants have not argued that the charge is untimely with respect to any incidents of harassment. Again the issue does not destroy subject matter jurisdiction. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

There is no need to relate them; they make Creviston's advances on Bohen seem mild. Rivera-Breger says that she reported these encounters to Deputy Chief Podkul, though in less detail than on the stand. (It is easy to see why. It must be hard to report such personal humiliation to supervisors known to be life-long friends of Creviston. Rivera-Breger, said to be very strong, broke down on the stand even though Creviston's advances ended in late 1979. And an expert witness testified that reticence about complaining and a diminished sense of self-worth are common in cases of sexual harassment.) Podkul denied receiving these reports, but Podkul had trouble remembering many other things, and I give his testimony little weight. There was another important source of corroboration. John Wozniak, formerly the head of training at the department, confirmed that firefighters engage in some pretty raw sexual talk. This was usually—but not always—kept out of the communications room. No surprise that firefighters behave this way, and it supports Bohen's story.

Creviston denied everything. He denied coming to work under the influence, but every witness had heard about or seen evidence of his drinking. One incident illustrates the distance between Creviston and the truth. One night he arrived at the fire station with Carol Buitron, another dispatcher, after an automobile accident. At Bohen's request Creviston's daughter arrived to take him home, and there was a shouting match in which his daughter accused him of infidelity to his wife. Witnesses too numerous to count described this traumatic event in the life of the fire station. Creviston, however, denied that anything had happened. Just a little scrape, said he, and I called my daughter who took me home without incident. As for drinking, I drank only an occasional beer with a sandwich, never anything more. The man's testimony was fabricated from beginning to end.

I find that Creviston touched Bohen offensively and repeatedly, that Creviston insisted that Bohen keep the bathroom door open, that Captain Bianci made a veiled threat of rape, that the conversation in the fire station was filled with lurid sexual descriptions, and that when Bohen declined to take part in all this good fun some officers spread a rumor that Bohen is a lesbian. Jancek, Podkul, and other supervisory officials knew the general picture if not the details; more, Creviston was himself a supervisor, and his conduct is properly attributed to the department under 29 C.F.R. § 1604.11(d). See *Horn v. Duke Homes*, 755 F.2d 599, 604 (7th Cir.1985). But Bohen did not yield to any of this, and participating in sexual escapades was not a requirement of the job or a method of advancement on the job. The sexually offensive atmosphere simply made working as a dispatcher a great deal more aggravating and humiliating; had Bohen been male, she would not have suffered as she did. The sexual harassment was in that sense a "condition" of employment, just as it would have been a discriminatory "condition" of employment if women were required to work in dirtier or noisier places than men.[2]

II

Bohen maintains that she was fired in retaliation for filing the charge with the EEOC and obtaining the right to sue. If that is so, she is entitled to relief. See *Klein v. Trustees of Indiana University*, 766 F.2d 275 (7th Cir.1985). She also maintains that even if she was not a model employee, she would not have been fired if she were black. Again, if that is so she is entitled to relief. See *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976). I need not decide whether Bohen has established a prima facie case on either line of argument. The department offered a plausible reason for her discharge. Now that the trial has been held, the only question is whether Bohen established that her charge, her sex, or her national origin was

---

**2.** For reasons discussed in Part III, I do not decide whether this is the meaning of "condition" in Title VII. It may be that "terms or conditions of employment" refers to the formal rules and standards of the job, rather than the amenities of work.

a but-for cause of her discharge. See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *United States Postal Service v. Aikens*, 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1482–83, 75 L.Ed.2d 403 (1983).

■ She did not. The department demonstrated that almost from the day she joined the department Bohen was a complainer whose deportment became more and more obnoxious. For example, in February 1980, two months after she arrived, Bohen became involved in a shouting match with Connie Turner in which the two hurled epithets at one another—racial epithets from Bohen to Turner (who is black) and sexual epithets from Turner to Bohen (who Turner accused of being a lesbian). The two were about to come to blows (Turner was armed with the coffee pot) when supervisors intervened. The cause of the dispute is obscure. Bohen stalked off the job rather than discuss the affair. She was reprimanded and not paid for the day. Turner was reprimanded and relieved from duty for one day. Both were warned that further confrontations would lead to dismissal. Supervisors had legitimate concern that personal grievances not get in the way of performance on the job.

Turner promptly quit. In Bohen's case there were many further confrontations. With the exception of Rivera-Breger, every witness in the case described Bohen as high strung and stuck up (she had two years of college and apparently never let anyone forget it, and she also made it painfully clear to all that she was much better at her job than they at theirs). When someone pointed out a flaw in her performance, she would deny the flaw and then try to find the same flaw in others. (Many of her written complaints against others are in the record.) Bohen also was nosy. Adelle Herrera Granda described an incident in which Bohen called Herrera's boyfriend to pass on a rumor that Herrera was not entirely faithful to him. Needless to say this caused a set-to. Many witnesses testified that Bohen would abjure the small rules of the office—the uniform, the requirement that dispatchers stay at the console at all times—and that this caused a great deal of friction.

Many unpleasant episodes give the flavor of the working relation. In February 1982 Jancek informed Bohen, who had not been wearing the regulation uniform for 3½ months, that she must do so immediately. She replied that it was not ready to be picked up. Further inquiry showed that this was because she had not appeared for a fitting. Jancek attempted to deliver a written reprimand, but Bohen refused to sign the reprimand to acknowledge its receipt. There followed a shouting match with Jancek, another shouting match with Creviston, and two charges of insubordination.

In March 1982 Assistant Chief Rizzardo, by all accounts a mild-mannered person, charged Bohen with making sarcastic remarks to him over the radio. Jancek reported in writing at the time that at a hearing to determine the truth of the matter Bohen took the charge, stuffed it in her bra, and huffed away; she denies all of this. According to Bohen, her perfectly civil denial of an unjust charge led to a meeting in Chief Ard's office in which the chief tried to hoist her by her lapels, striking her on the chin. More on this below.

By April 1982—well before Bohen filed a charge with the EEOC—things were sufficiently strained that Jancek asked Chief Ard to fire Bohen. Jancek's memorandum to the chief charges that Bohen "shows no regard for the feelings and situations of her co-workers, causing constant turmoil and dissention, which in turn effects her co-workers ability to function", that she "refuses to accept constructive criticism and further more will and does blame her mistakes on others", that whenever reprimanded she "will bring race into the issue", that she "displays severe persecution complex", and perhaps most importantly from Jancek's perspective that she "shows no respect for Departmental Authority and has constantly displayed abusive language and insubordinate action to Authority." I

conclude that as of April 1982 all of these charges were accurate descriptions of Bohen's behavior and relations on the job. But Chief Ard rejected Jancek's recommendation. He made a note on the memorandum that he had elected to give Bohen a verbal reprimand and another chance.

Things apparently did not improve. In addition to mundane events, the record shows an exchange of verbal abuse between Bohen and Deputy Chief Dawson in December 1982. Bohen wanted access to her personnel file, and Dawson's request that she put the request in writing led to an extended contretemps. Bohen was charged with insubordination again and docked two days' pay after she refused either to acknowledge the charge or attend the hearing on it.[3]

On January 4, 1983, Bohen filed a criminal complaint against Chief Ard. She swore out the complaint based on the battery that she says occurred in Chief Ard's office in March or April 1982. This charge also was a centerpiece of the conciliation hearing before the EEOC in January 1983, which Chief Ard attended. Bohen says she filed the charge because otherwise the EEOC would not believe her allegations against Ard. But the very fact of delay from March until January casts doubt on the veracity of the story. Chief Ard says that he left the conciliation hearing disgusted, not wanting to see Bohen again. I do not blame him, for the filing of an unfounded charge of battery is serious business. The local prosecutor declined to press the case. Chief Ard denies that the incident occurred, and I believe Chief Ard.

On February 17, 1983, Bohen filed a new charge, this time alleging that Assistant Chief Mulle had slashed the tires of her car. She complained to the police (who took no action), to the small claims court (which ruled in favor of Mulle), and to the department, which opened an investigation. Mulle and Creviston (who had been in the parking lot when Mulle supposedly did the

deed) signed written denials. Bohen demanded that polygraph tests be administered to both principals. Mulle took the test and passed. Bohen refused to take the test, ultimately bringing in a letter from counsel advising her not to do so. The letter gave no reason. Deputy Chief Dawson then issued a finding absolving Mulle from the charge.

There may have been some further unpleasantries, but apparently the criminal charges against Ard and Mulle exceeded the department's endurance. Dawson drew up the letter firing Bohen while Ard was in the hospital, and when Ard returned to work he immediately consented to the idea. Dawson discussed the matter with the other senior members of the staff; there was no dissent.

■ Bohen argues, and both Dawson and Ard conceded, that none of the incidents standing alone led the department to fire her. There is some conflict in the testimony about the timing of the decision and which incident was deemed the last straw. It may even be that the chief responsibly could have given Bohen still another chance (although she had been teetering on the brink of dismissal since February 1980). An employer may conclude that incidents, individually not enough to discharge an employee, collectively demonstrate that the employment should come to an end. At all events Title VII does not require careful employment decisions. It does not establish merit selection in employment. A decision need not be *right* to be lawful; it is enough that the decision be the same one that would have been made if the employee were of a different sex or national origin, or if the employee had not filed the charge with the EEOC. See *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1978); *Bishop v. Wood*, 426 U.S. 341, 349–50 (1976); *Nellis v. Brown County*, 722 F.2d 853, 858–61 (7th Cir.

---

**3.** Bohen actually lost only one day's pay. One general note: Here and elsewhere, I need not and do not resolve who was in the right in these confrontations. The point is that the shouting match itself, and the refusal to attend the hearing, are well documented.

1983). I am convinced that the decision to fire Bohen had been coming for a long time, and that the charge, her sex, and her national origin had nothing to do with the decision. The reasons to let her go were more than sufficient.

Now it might be that the department could not have fired Bohen for obstinate conduct if the sexual harassment were the cause of her attitude. I conclude, however, that it was not. Although an expert on sexual harassment testified for Bohen that harassment may lead to tension, anxiety, loss of sleep, diminished self-worth, nausea, cramps, and headaches, the expert did not suggest that harassment commonly leads to prolonged shouting matches and the filing of false criminal charges. Bohen was in trouble in February 1980, only two months into her employment; ours is not the case of a mild-mannered person slowly driven mad by unwanted sexual attention. A conclusion that the sexual harassment caused the attitudes that led to Bohen's discharge would be pure speculation.[4]

■ In saying that Bohen would have been fired no matter what, I have not overlooked her evidence of disparate treatment. Often the differential treatment of similarly-situated employees will be the best evidence of the motive for an action. The employer may deny taking sex into account—may even consciously believe that the employee's sex, race, or origin did not matter—yet still violate the statute if one of the prohibited grounds in fact accounts for the action. See *Mozee v. Jeffboat, Inc.*, 746 F.2d 365 (7th Cir.1984). Subconscious discrimination is nonetheless unlawful, and comparative evidence may be the best, even the only, way to find out what really matters to employment decisions.

Problems of attitude to one side, Bohen was a capable dispatcher. She has several commendations from Chief Ard. She scored second-best (behind Rivera-Breger) in a test of knowledge of what equipment to send to what kind of fire where. The training officer testified that she had good potential. Bohen's comparative evidence is essentially that many of the employees who did not get fired were incompetent. Creviston is a drunken letcher. Carol Buitron often arrived late and was not very good at the job when she arrived; once she was suspended for intoxication on the job. Delores Peterson was not very good. Catherine Casey was illiterate and incapable of sending the right equipment to the right place. Peterson and Casey are black, Creviston and Buitron white.

Although the record contains evidence that Buitron and Casey were disciplined, neither was fired. Creviston was made Head Dispatcher for two years and never disciplined. Peterson was tolerated for a long time; she is no longer with the department and may have been fired, but the record is unclear. The evidence is strongest with respect to Casey. *Everyone* at the department, from training officer to fire chief, regarded Casey as incompetent. For some time she was assigned to work in teams of three dispatchers; the other two apparently would do the work. The most anyone will say about Casey's performance even today is that she has "improved;" no one says that she is good at the job.

■ Despite all this, I am convinced that sex and national origin played no role in Bohen's discharge. None of the other employees charged Chief Ard or any other supervisor with a crime. Casey and Creviston apparently have political or personal patrons—Chief Ard for Casey, Mayor Pastrick for Creviston. The position of dis-

4. I do not mean that a plaintiff must produce an expert who links her problems to the harassment. "Experts" on this subject know no more than judges about what causes mental changes—which is to say that they know almost nothing. If Bohen had established some gradual change in her personality, I would be inclined to find causation. But Bohen did not do this; there is no evidence about her history of earlier employment (other than the fact that she held jobs, at least one of very short duration). None of her friends or children testified about her demeanor and how it changed over time. Bohen maintained, indeed, that the shouting matches never occurred, so perhaps she would have had a hard time simultaneously arguing that she came unglued as a result of harassment.

patcher is not covered by the civil service, and patronage systems have been known to tolerate incompetence in employees of any color, age, and sex. Perhaps more important, I cannot resist the conclusion that in the fire department of the City of East Chicago competence is not highly valued. Creviston and then Cyrus Horvath got to be supervisors instead of Francine Rivera-Breger because they were friends of the higher-ups, not necessarily because they were best for the job. (This is not the same as veiled discrimination, either. Chief Ard and Deputy Chief Dawson are black, other supervisors are white of many national origins, so that almost everyone had a potential friend. Friendship and political patronage are outside Title VII, and the fact that both the patron and the beneficiary must have some race and sex does not mean that Title VII prohibits all patronage.)

The department can and does live with substandard performance. There are two dispatchers on duty; one can cover for the other. What this paramilitary organization cannot live with is sass. Backtalk, disrespect, inattention to Authority—these are the capital offenses. They require disciplinary tribunals that consume time; and when the subject of the discipline does not fess up, the supervisors feel belittled.

 This attitude may be good or bad. That really does not matter. What does matter is that a demand for respect is a dispositive factor other than sex, national origin, and the filing of a charge with the EEOC. Cf. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (rejecting a first amendment challenge to a discharge for backtalk and rabble-rousing in the office). All of the other employees meekly jumped when Authority told them to jump. There is uncontradicted testimony that Casey and the others were cooperative, took correction well, and tried. The department was willing to excuse inadequate results. It was not willing to excuse sass. This is a choice a local government may make without violating Title VII or the constitution.

## III

 Bohen was the victim of harassment on account of her sex. But because she did not quit in disgust, and instead was fired for cause, she would not be entitled to reinstatement or back pay even if I should conclude that the harassment violated Title VII. Does the statute give Bohen any other remedy? The remedial provision, 42 U.S.C. § 2000e–5(g), states that a court may enjoin the employer from engaging in an unlawful practice "and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate."

 Bohen lacks standing to obtain an injunction or other "affirmative action" concerning the department, where she will not work again. See *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–05, 103 S.Ct. 1660, 1664–66, 75 L.Ed.2d 675 (1983). Because the statute is limited to "equitable" relief, I also may not award damages, whether punitive or compensatory for mental anguish. *Great American Federal Savings & Loan Association v. Novotny,* 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979) (dictum); *Bundy v. Jackson,* 641 F.2d 934, 946 n. 12 (D.C.Cir. 1981); *DeGrace v. Rumsfeld,* 614 F.2d 796, 808 (1st Cir.1980) (collecting cases). The Eighth Circuit once suggested that compensatory damages for humiliation or emotional suffering are available under Title VII, but it has reversed itself. Compare *Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1272–73 (8th Cir.1981), with *Muldrew v. Anheuser-Busch, Inc.,* 728 F.2d 989, 992 n. 2 (8th Cir.1984).

The Seventh Circuit has not addressed this question, but I think it likely to follow these decisions. The statute authorizes back pay and "other equitable relief". An award of damages for humiliation and anguish is classic "legal" relief. It is compensation for harm done, not a restoration to a prior position. Title VII could not

permit "legal" relief without affording both parties the right to trial by jury, which it does not. Every court that has considered the question has held that because the statute permits only "equitable" relief, the Seventh Amendment does not apply. See *Novotny, supra,* 442 U.S. at 375 n. 19, 99 S.Ct. at 2350 n. 19 (collecting cases). Cf. *Curtis v. Loether,* 415 U.S. 189, 196–98, 94 S.Ct. 1005, 1009–10, 39 L.Ed.2d 260 (1974), in which the Court characterizes Title VII as authorizing only equitable relief and for that reason distinguishes Title VIII of the Civil Rights Act of 1968, which the Court holds permits recovery of actual and punitive damages and therefore is covered by the Seventh Amendment.

▪ The remedial provisions of Title VII were designed to track those of the National Labor Relations Act, 29 U.S.C. § 160(c). See *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419 & n. 11, 95 S.Ct. 2362, 2372 & n. 11, 45 L.Ed.2d 280 (1975). The NLRA permits only reinstatement, back pay, and related equitable relief. An employee repeatedly insulted and harrassed on account of his membership in a union has no remedy unless he is fired (or quits in a constructive discharge), or unless the NLRB requires the employer to alter its employment practices in the future. The offended employee's remedy is under the state law of torts, not under the federal statute. And so it goes with Title VII. E.g., *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363–65 (11th Cir.1982).

▪ A number of courts nonetheless have held that a harrassed employee may obtain "nominal damages" under Title VII. E.g., *Katz v. Dole,* 709 F.2d 251, 253 n. 1 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897, 905–06 & n. 12 (11th Cir.1982) (collecting cases). The impetus for these

holdings is pretty plain. In a case such as Bohen's, in which back pay or reinstatement is impossible, if *all* sources of compensatory damages are foreclosed then the defendants must prevail in the litigation. A court may not enter a declaratory judgment of liability, for that would be an advisory opinion. The parties no longer have a live controversy about how the fire department shall run its operations; Bohen has no interest in anything but damages. If she cannot get damages she must lose outright. See *Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

Judgment for the defendants means that the plaintiff does not get the psychological boost that comes from a judicial recognition that she has been wronged; it also means that her counsel cannot receive attorneys' fees from the defendants. The plaintiff's desire for psychological vindication, however deeply felt, cannot keep alive a case that is otherwise moot. See *Ashcroft, supra; Lyons, supra;* cf. *Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984) (abstract stigmatic injury is not a basis of standing); *Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.,* 454 U.S. 464, 482–87, 102 S.Ct. 752, 763–66, 70 L.Ed.2d 700 (1982) (mental distress caused by violations of law do not give standing when there is no other basis of relief).[5] Thus it is no surprise that judges have strained to find some way to award damages to people for whom reinstatement and back pay are foreclosed.

▪ Although I understand why some courts permit the award of nominal damages, I do not agree with their decisions. Nominal damages are not "equitable" relief within the meaning of Title VII. The statute does not mention them, and I could not award them without offer-

---

5. I put to one side the possibility that a court may give judgment for plaintiffs just *because* that would permit an award of fees. Such bootstrapping would eliminate the "case or controversy" requirement of Article III. Any plaintiff—even a bystander to the events in question—could obtain a judicial decision by pointing to the fact that if he won the court would

award fees, even if he was entitled to no other relief. I doubt that Congress meant, when creating an entitlement to fees, to wash away two centuries of jurisprudence limiting the power of federal courts to give advisory opinions. Unless a plaintiff establishes a right to relief independent of the desire to obtain legal fees, a court should not reach the merits of the dispute.

ing the defendants a jury trial. Too, "nominal" damages are not something a court awards just to keep a case alive. The traditional award of one dollar is the remedy in a case in which compensatory relief is available in principle, but plaintiff did not establish the amount of injury and so cannot obtain a substantial award. Substantial injury yields a substantial award, nominal injury a nominal award. See *Carey v. Piphus*, 435 U.S. 247, 262–67, 98 S.Ct. 1042, 1051–54, 55 L.Ed.2d 252 (1978). A judge who lacks the power to award substantial damages that have been proved—and Bohen's anguish would support an award of at least $20,000 in compensatory damages [6]—may not use nominal damages as heart balm. The reasons that block an award of actual damages also block an award of nominal damages. See *Harrington v. Vandalia-Butler Board of Education*, 585 F.2d 192, 198 n. 6 (6th Cir. 1978).

Because Bohen may not recover any award under Title VII, defendants must receive judgment whether or not there was a violation. I therefore do not decide whether Bohen would be entitled to relief if it were possible to award damages. Several courts of appeals have held that a sexually oppressive working environment violates Title VII because the humiliation women face is a "condition" of employment from which men are excused.[7] This is undoubtedly so if submission to sexual advances is required for employment; then sexual favors are a requirement ("term or condition") imposed on women but not on men. It is not so clear that "term or condition" of employment—which ordinarily means a written rule or requisite for being or staying employed, cf. *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct.

2229, 81 L.Ed.2d 59 (1984)—also encompasses the amenities of life on the job. There is no pertinent legislative history, and arguments on this subject may be made in several directions. Compare *Vinson v. Taylor*, 753 F.2d 141 (D.C.Cir.1985), with *id.*, 760 F.2d 1330 (D.C.Cir.1985) (Bork, J., dissenting from the denial of rehearing en banc). The unavailability of any relief in this case makes it inappropriate for me to decide whether Bohen would have prevailed on the merits.

 The restrictions on relief under Title VII do not apply to 42 U.S.C. § 1983. To recover compensatory or punitive damages under § 1983, however, Bohen must establish a violation of the equal protection clause of the fourteenth amendment. The Supreme Court has not held that sexual harassment violates the constitution. The Seventh Circuit once hinted that it does, see *Huebschen v. Department of Health and Social Services*, 716 F.2d 1167 (7th Cir.1983), but the case held only that there had been no distinction on account of sex and so did not reach the issue.

As an original matter it is most unlikely that the male legislators who enacted the fourteenth amendment well before women could vote created a right to be free of sexual harassment, or of any other distinctions on account of sex. When *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), first held that a distinction on the basis of sex is unconstitutional, it did so on the argument that sex was an irrational ground of distinction for the legislation at hand. Cf. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (government may not decline to hire on the basis of sex). Since *Reed* the Court has repeatedly declined to place sex among the

---

**6.** See the series of cases awarding sums in this range for unwarranted strip searches. E.g., *Joan W. v. City of Chicago*, 771 F.2d 1020 (7th Cir.1985). The humiliation Bohen suffered, and its effects, are at least as serious.

**7.** E.g., *Katz v. Dole*, 709 F.2d 251 (6th Cir.1983); *Henson v. City of Dundee, supra*; *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981). The Seventh Circuit has held that an employer may not make

"sexual consideration" a condition of employment but has not decided whether simple harassment violates Title VII. *Horn v. Duke Homes, supra*, 755 F.2d at 603 & n. 2. See also *Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1182 (7th Cir.1982), which suggests in dictum that a working environment unpleasant on racial grounds is an unlawful "condition" of employment under Title VII.

categories, such as race, that are almost always off limits to decisionmakers. Yet even with respect to race, the Court has never held that harassment and humiliation standing by themselves violate the fourteenth amendment.

Although in one sense the "government" has interfered with Bohen's peace of mind and has denied her a working environment on a par with that available to male employees, in another sense the "government" has done nothing at all. The employees of the fire department all have their private agendas, some of which include making sexual advances on other employees or otherwise being obnoxious. The fundamental decision of the department was to do nothing—to offer no protection to its female dispatchers against the depradations of male employees. So far as this record shows, the decision to be passive offered everyone "equal protection" from such depradations—that it, the department offered no one protection of any kind. Males could accost females, males could accost males, females could accost males, females could accost females, and if the department had any bisexuals they could have accosted everyone in sight. The department did not offer women a lower degree of protection; no protection is all it offered anyone.

■■■ This may be cruel, but it is not unconstitutional. The constitution is a charter of negative liberties and does not require the state to protect women from rape and murder, let alone from obnoxious conduct by fellow workers. See *Hinman v. Lincoln Towing Service, Inc.*, 771 F.2d 189, 194 (7th Cir.1985) (collecting cases). Title VII may impose such affirmative duties on employees, but the constitution is a different matter. The state is essentially a neutral bystander here. True, the department as an entity can be said to "know"—as much as a collective entity knows anything—that some women do not receive the same psychic benefits on the

job even though they have the same formal conditions and salary as men. But this is not the same thing as intentional discrimination against women as a class. The equal protection clause does not proscribe all disparate effects; it bans only intentional discrimination. Here there was no decision by Chief Ard (or anyone else acting in the interests of the City or the Department) to treat women differently "because of" the injury it would do them; sexual harassment hurts rather than helps the government, because it makes it harder to attract competent employees; there was at most a decision to be passive "in spite of" the costs to the female dispatchers.[8] *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

■■■ The constitution is not a fount of tort law. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In a number of states sexual harassment now is deemed tortious. The tort is similar to the intentional infliction of emotional distress, which is a few decades old but still, compared with the fourteenth amendment, quite new. See Prosser & Keeton, *Torts* § 12 (5th ed. 1984). The Seventh Circuit recently held that this tort—like libel, the much older tort discussed in *Paul*—is not secured by the fourteenth amendment. See *Cameron v. IRS*, 773 F.2d 126, 129 (7th Cir.1985). Cf. *Gumz v. Morrissette*, 772 F.2d 1395, 1408–09 (7th Cir.1985) (Easterbrook, J., concurring). Employees of the government may commit the tort without simultaneously violating the constitution.

■■■ For that matter, the constitution did not abolish the fellow servant rule of tort law. Well after the effective date of the fourteenth amendment, an employee could not recover from the employer for injuries inflicted by the negligence of fel-

---

8. If Bohen had shown that the department caused her harassment to advance some governmental interest, or maybe even the political

career of Chief Ard, this might have been a different case. Cf. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982).

**1248**

low employees. Still less could the employee recover from the employer for the intentional torts of fellow employees; these were said to be personal frolics, outside the scope of employment. Tort law has changed dramatically in the interim, but the constitution neither requires nor follows all of these changes. Under § 1983 a governmental entity is responsible only for its own decisions and wrongs; not even so mundane a principle as respondeat superior (which predated 1869) applies. See *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). So even if sexual harassment when perpetrated as a matter of governmental policy violates the equal protection clause, Bohen cannot benefit from such a rule; the harassment here was not a matter of policy. And the people who did harass Bohen were not exercising governmental power.

This leads to a harsh result; Bohen loses even though she has been seriously wronged. But the constitution is an old document, and courts cannot mold it like Silly Putty to fit every new shape. The constitution is a framework of government, not a book of nostrums for every modern ill. Governments at many levels, and courts shaping the law of torts through the method of the common law, may respond to Bohen's legitimate grievance. Congress has not yet dealt with cases in which harassment does not lead to discharge, and Bohen has not sought relief under state law. The disposition of this case may suggest to legislative bodies the need for attention to existing rules, but Bohen, unfortunately, must lose today. The clerk will enter judgment for the defendants.