**Beatrice WILLIAMSON, Plaintiff-Appellee—Cross-Appellant,**

v.

**HANDY BUTTON MACHINE COMPANY, Defendant-Appellant—Cross-Appellee.**

Nos. 86–2019, 86–2049.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1987.

Decided May 4, 1987.

Rehearing and Rehearing En Banc Denied June 11, 1987.

Donald L. Johnson, Johnson & Schwartz, Chicago, Ill., for defendant-appellant-cross-appellee.

Mark E. Furlane, Gardner, Carton & Douglas, Chicago, Ill., for plaintiff-appellee-cross-appellant.

Before EASTERBROOK and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Beatrice Williamson worked for 21 years at the Handy Button Machine Co., principally as an assembly operator. She was fired in 1977 after she failed to reply to a telegram from Handy Button. The jury in this case under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., was entitled to find that Williamson did not answer the telegram because she had been driven to distraction by racial discrimination and the abusive behavior of her supervisor. She has been unable to work since. She recovered $150,000 in compensatory and $100,000 in punitive damages. While the jury was deliberating on the case under § 1981, the district judge found that Williamson had not established sex discrimination in violation of Title VII and had demonstrated only two episodes of racial discrimination, which had not caused the discharge. The judge nonetheless declined to set aside the jury's verdict, holding that its view of the evidence was as permissible as his own.

I

The evidence, which we narrate in the light most favorable to the verdict, shows that during her entire career at Handy Button, Williamson was assigned unskilled entry-level work, although she was able to do higher-paying work such as inspection (and did so on occasion). Between 1968 and 1976 Williamson repeatedly applied for work as an inspector and saw white employees with less seniority promoted over her. In 1975 she and about ten other assembly workers were demoted to the sorting department because of a slowdown in work at the plant. Sorting is a dirty, boring job. Although sorting and assembly pay the same base wage, assemblers may earn a maximum bonus of $12 per week. Most weeks Williamson had earned the maximum bonus; she was not eligible for a bonus in sorting. Williamson was the only black employee demoted—and the most senior. Under the collective bargaining agreement, she should have been the first returned to assembly. But as work picked up, only white employees junior to William-

son were returned to assembly. She protested to the supervisor of assembly, to no avail.

In July 1975, as white employees were being returned to the assembly department, Williamson began to have uncontrollable crying spells. By February 1976 she was under medical care for depression and was taking drugs for the condition. She began to stay home ill. In late 1976 another inspector's job was filled by a white employee junior to her, without any opportunity to apply for the vacancy, despite the collective bargaining agreement's requirement that openings be posted for applications. Williamson filed a charge of discrimination with the EEOC; Handy Button learned of this charge no later than January 1977. In early March 1977 Williamson took a week of vacation time she had accrued, informing the company at the last minute. When she returned, supervisor Mervyn Mendel handed her a stiff note denying permission to take the vacation because she had not given "advance notice". The firm had no requirement that employees seek permission before taking vacations. (The memo was a blot on her record but had no immediate effect on her income, because the vacation had been unpaid.) On March 15, 1977, Williamson went to the upstairs washroom (where she had been assigned a locker by the company) to remove her work clothes and wash up at the end of the day. Mendel confronted her after she left and in loud, scatological language berated her for using the upstairs washroom rather than a different one.

This event, according to a psychiatrist's testimony, was the "straw that broke the camel's back." Williamson went home, never to return to work. The psychiatrist stated that she had a "major depressive disorder" that was "a 10 on a 10–point scale" of seriousness. On March 28 the firm sent her a telegram instructing her to call the company by March 30 to let it know when she would return to work. She did not respond and was fired. The jury could conclude that, as a result of Mendel's handiwork, Williamson was unable to understand the telegram, let alone to respond. Williamson testified that although she had been able to read, for many years after the incident she could neither read nor understand anything except the Bible. The firm did not call to find out why she had not answered the telegram, and it did not reinstate her after a psychiatrist explained the lack of response—although it had done both for other employees. Williamson, who was 52 when fired, has not been able to work since. Handy Button does not contend that she is a malingerer. (She worked as a teachers' aide for a year but was emotionally unable to continue.) The Social Security Administration concluded in 1978 that she is completely disabled and awarded disability benefits.

The jury answered seven interrogatories. It found that Williamson (1) was denied a transfer back to assembly because of her race; (2) was denied promotion to inspector because of her race; (3) was denied a week's vacation because of her race; (4) was refused permission to use the upstairs bathroom because of her race; (5) was "berated and verbally abused" because of her race; (6) was fired because of her race; and (7) was treated adversely because of her complaint alleging discrimination. The jury fixed damages at $10,000 for psychological disability and emotional pain, $130,000 for "earnings lost and the present cash value of the earnings reasonably certain to be lost in the future", and $10,000 for the expenses of medical and psychological treatment. It awarded $100,000 more as punitive damages. Handy Button conceded at oral argument that the compensatory damages are supported by the record, if the evidence demonstrates that Handy Button's discriminatory conduct caused Williamson's breakdown and discharge. It does. Whether it is more than minimally sufficient we need not say.

 Handy Button insists that the judge's more confined view of the evidence controls because rendered first, while the jury was deliberating. Not so. Title VII proceedings are "equitable" and § 1981 proceedings are "legal", so that the plaintiff has a right to a jury trial only on the § 1981 claim. But when the two are tried together, the jury's verdict governs factual

issues common to them. *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir.1986). The constitutional right to a jury trial may not be abridged by a court's deciding the equitable portion of a case first. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Timing might be important if the Title VII claim had been filed as a separate suit, so that principles of preclusion applied to the § 1981 claim. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 333–37, 99 S.Ct. 645, 652–54, 58 L.Ed.2d 552 (1979). Ours is not a problem of preclusion, however, for there was but one trial. The jury's verdict governs.

■ The jury could infer discrimination. Handy Button never offered an explanation for keeping Williamson in the plant's lowest-paying job, despite her entitlement by seniority to the assembly job. It never offered an explanation for failing to promote her to inspector between 1968 and late 1976, when it first stated that it wanted inspectors to have high school degrees, itself a potential ground of liability. See *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The jury was entitled to infer discrimination from the fact that a qualified black employee repeatedly, and without explanation, was passed over in favor of whites for better jobs, including one to which the black employee was contractually entitled and in which she served competently. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This discrimination contributed to Williamson's mental deterioration. Perhaps she was unusually sensitive, but a tortfeasor takes its victims as it finds them. E.g., *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (1891); *Stoleson v. United States*, 708 F.2d 1217, 1221 (7th Cir.1983); *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 820 (7th Cir.1985). In some cases unusual sensitivity will enhance the loss; in others unusual hardiness will reduce it; payment of the actual damage in each case will both compensate the victim and lead the injurer to take account of the full consequences of its acts. (The injurer expects to pay the average injury caused by conduct of the sort.)

Williamson's breakdown led to her discharge. Handy Button played on this. The district court observed: "It was [Handy Button's] litigation strategy to agree that [Williamson] was emotionally disturbed and, indeed, the more disturbed the better. [Handy Button] seemed anxious to bring out and capitalize upon the suggestion of the psychiatrist that [Williamson] may even have been psychotic...." This led Handy Button to embrace "expert" testimony that has questionable value—see *Bohen v. City of East Chicago*, 622 F.Supp. 1234, 1243 n. 4 (N.D.Ind.1985), reversed in part on other grounds, 799 F.2d 1180 (7th Cir.1986) (" 'Experts' on this subject know no more than judges about what causes mental changes—which is to say that they know almost nothing.")—and to emphasize other evidence of instability. Perhaps Handy Button believed that if the jury thought Williamson crazy, it would see why Handy Button dismissed her. The risk was that the jury would conclude that Handy Button had *driven* Williamson to distraction; the jury so found.

■ Handy Button is liable under the civil rights laws for Williamson's principal injury—her *continued* inability to work—only if the emotional instability came from the racial discrimination. Handy Button might have tried to argue that Williamson's breakdown was attributable to boorish conduct by Mendel, her supervisor in 1977. Personal animosity, even monstrous conduct, is not actionable under § 1981 and Title VII unless based on race. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 465 & n. 9 (7th Cir.1986). A breakdown caused by non-racial offensiveness might explain why Williamson could not respond to the telegram and therefore support an award of damages until Williamson could have found another job (had she been emotionally stable), but it would not justify an award of a lifetime's lost income. Handy Button did not try to pry apart the racial and non-racial causes of Williamson's distress, however. It stood by as evidence of personal animosity came in, and it did not request limiting instructions or suggest that the jury be told to separate racial and

other causes of Williamson's inability to work after she had been fired.

The evidence was not so thin that we must step in to protect defendants who did not protect themselves. Even if there had been no intervening acts of discrimination, the jury would have been entitled to find that the discriminatory failure to return Williamson to the assembly department was a cause of her breakdown. The jury also was entitled to infer that the vacation and washroom incidents, and the firm's refusal to call her or reinstate her after learning of the cause of her failure to respond, had race at their core. True, none of these events involved racial epithets, and the employer offered neutral explanations for each. But once a jury decides that an employer makes use of race in its everyday decisions—in this case, that it held Williamson's race against her over a decade—it is permissible to infer that race also explains other disparate treatment. Handy Button did not try to show, for example, that Mendel cursed white employees who used the upstairs washroom. The firm also was more tolerant of white employees who became ill. The jury's finding of liability must stand.

This makes it unnecessary to explore liability under Title VII for racial discrimination, because an award for racial discrimination under a different statute would be redundant. Williamson also charged that Handy Button engaged in sex discrimination, in violation of Title VII, by not promoting her to inspector. This question was not submitted to the jury under § 1981, which does not deal with sex discrimination. The judgment on the sex discrimination claim could have a small influence on the award of damages. We affirm the district court's conclusions as not clearly erroneous. *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Benzies v. Illinois Department of Mental Health & Developmental Disabilities*, 810 F.2d 146 (7th Cir.1987). This is one of many cases that could go either way.

**II**

The court gave this instruction on punitive damages:

If you find that the defendant was guilty of discrimination against the plaintiff because of her race or that defendant terminated plaintiff in retaliation for her having filed discrimination charges ..., and if you believe that justice and the public good require it, you may, in addition to any compensatory damages to which you find plaintiff entitled, award plaintiff an amount which will serve to punish the defendant and to deter others from the commission of like offenses.

The instruction left the jury at sea. Although the court gave some guidance on how to set the amount of punitive damages (by reference to punishment and deterrence), it offered none on when punitive damages are appropriate. Telling jurors to award punitive damages "if you believe that justice and the public good require it" is the equivalent of telling them to award punitive damages "if you want to." "Justice" and the "public good" are not terms with widely understood meanings. Handy Button did not object to this instruction. It objected to giving any instruction at all, which is not the same as objecting to the language of the instruction given. The objection must be sufficiently detailed to draw the court's attention to the defect. A blunderbuss objection does not do this.

No doctrine of "plain error" protects parties from the consequences of their decisions in civil litigation. E.g., *Walker v. Maccabees Mutual Life Insurance Co.*, 753 F.2d 599, 602 (7th Cir.1985); *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1312 (7th Cir.1985). Compare *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256–57 & n. 12, 101 S.Ct. 2748, 2754 & n. 12, 69 L.Ed.2d 616 (1981) (potential exception if issue has been contested and error may be corrected without a new trial), with *City of Springfield v. Kibbe*, ___ U.S. ___, 107 S.Ct. 1114, 1115–16, 94 L.Ed.2d 293 (1987) (appellate courts should not question the propriety of instructions given without objection). Failure to object may even have been part of

Handy Button's litigation strategy. It sought to blame Williamson's discharge on her emotional state, and Handy Button therefore may have believed that an open-ended instruction gave its argument maximum play. (Handy Button does not object to the instruction even now; it simply says the evidence is too weak.) In retrospect the choice was unwise, but such second-guessing is not a ground on which to set aside verdicts. This instruction therefore states the law of the case. "[I]n a civil case, each party must live with the legal theory reflected in instructions to which it does not object." *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 675 (7th Cir.1985).

■ The evidence was sufficient to support an award of punitive damages under this instruction. (It is hard to see what evidence would be insufficient, provided the jury found liability and awarded compensatory damages.) Handy Button does not contend that an award of $100,000 is excessive. When an offense is concealable or difficult to prosecute successfully, it is necessary to multiply the damages to deter wrongdoers. The multiplier of 1.67 produced by this award is hardly the work of a runaway jury. The law has many double and treble damages provisions. Handy Button argues only that there should have been no punitive award. That argument cannot succeed, given the instruction to the jury.

Handy Button has preserved only an objection to a punitive damages instruction of any flavor. A party may challenge the sufficiency of the evidence even without objecting to the content of the instructions. *Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc.*, 619 F.2d 660, 662–63 (7th Cir.1980) (en banc). The evidence was sufficient to permit the submission of the question on an appropriate instruction, informing the jury that the award of punitive damages should be reserved for wilful wrongdoing or reckless indifference to the plaintiff's known rights. See *Smith v. Wade*, 461 U.S. 30, 51–55, 103 S.Ct. 1625, 1637–38, 75 L.Ed.2d 632 (1983) (a case decided under § 1983, but equally applicable to § 1981, see *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 514 (7th Cir.1986)). The jury was entitled to find that Handy Button had been discriminating against Williamson for a decade. It had passed her over for promotion many times, and later it kept her in the sorting department despite both her protests and the seniority rule in the collective bargaining agreement. This extended course of conduct suggests an official policy of discrimination as opposed to the work of a renegade supervisor. The rule against racial discrimination in employment is well understood; no employer has a good faith belief that discrimination is lawful. Cf. *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 308–12 (7th Cir.1986) (discussing other definitions of "wilful"). We sustained an award of punitive damages in *Yarbrough* on a thinner record.

*Smith v. Wade* suggests that any conduct violating § 1983 may support an award of punitive damages. This is deceiving, however, because the Court also observed that the plaintiff under § 1983 must surmount the defense of official immunity (461 U.S. at 55, 103 S.Ct. at 1639). The complete rule applicable to a defendant without the formal benefit of immunity therefore may be that intentional, illegal conduct may support an award of punitive damages when the application of the law to the facts at hand was so clear at the time of the act that reasonably competent people would have agreed on its application. See *Soderbeck v. Burnett County*, 752 F.2d 285, 289–91 (7th Cir.1985) (punitive damages usually depend on specific intent to violate a knowable right). Cf. *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987). An approach of this character still supports the submission of the question to the jury, given the clarity of the rule against racial discrimination in employment.

## III

Williamson asked the district court to add prejudgment interest to the award of back pay. The court declined, explaining: "The verdict, both compensatory and punitive, is in the upper range of what can reasonably be sustained. Adding interest

would, in the court's view, result in an excessive award." The compensatory award in question is $130,000, which covers both past and future earnings and the reduction in the value of Williamson's pension. It is hard to see how $130,000 could be thought in the "upper range". Williamson was five days from her 53d birthday when fired in 1977. She was making about $13,000 per year. Had she worked as a sorter from April 1977 through the time of trial in March 1986, she would have earned a little more than $127,000 (this includes the increases negotiated by the union in subsequent collective bargaining agreements and excludes her earnings as a teachers' aide). Employment for another three years, until retirement in 1989 at age 65, had a present value of about $54,274 at the time of trial (using the 1986 wage of $18,820 and discounting at 2% per year). The loss of 13 years' work reduced Williamson's pension by about $2,700 per year, starting in 1989. Considering Williamson's life expectancy, that reduction had a present value of about $24,000 at the time of trial. These computations would have supported an award of some $205,000 for lost income.

■ We also disagree with the premise of the district court's decision—that a court has discretion in § 1981 litigation to deny an award of prejudgment interest on an award of back wages because the court does not approve of the jury's award. Under 42 U.S.C. § 1988 a federal court is supposed to follow principles of state law when federal law does not supply a rule of decision. We observed in *Hunter*, 797 F.2d at 1426, that the common law requires judges to add prejudgment interest to awards of back pay. Neither the district court nor Handy Button cited any contrary statement of the law in Illinois, the forum state. We strongly hinted in *Hunter* that federal law would require the addition of prejudgment interest even if state law did not, because prejudgment interest is necessary to make the award fully compensatory. *Id.* at 1425–27. The award should make the victim whole. Williamson lost $9,436.93 for the nine months she was out of work in 1977. An award of $9,436.93 in

1987 does not make her whole. If she had received the money as wages in 1977 and invested it at 10%, readily available during those years on safe investments, she would have had $24,547.00 ten years later. (We disregard taxes.) A return of 15%, which was available on many investments, would have produced $38,286.87 in the same period. The increase substantially exceeds the 1.67 multiplier produced by the punitive damages. Handy Button had Williamson's money during these ten years and has been able to earn the market return. If Handy Button can turn over only $9,436.93, it has made a tidy profit on the arrangement. The effect of prejudgment interest on the wages for later years is less, but still significant.

■ We have held that prejudgment interest is part of full compensation under other statutes, necessary to carry out the federal policies of compensation and deterrence. E.g., *City of Chicago v. Department of Labor*, 753 F.2d 606, 608 (7th Cir.1985) (Comprehensive Employment and Training Act); *Heiar v. Crawford County*, 746 F.2d 1190, 1200 (7th Cir.1984) (ADEA); *Myron v. Chicoine*, 678 F.2d 727, 733–34 (7th Cir.1982) (Commodities Exchange Act). Twice in the last four years, the Supreme Court has held that "[p]rejudgment interest is an element of complete compensation". *West Virginia v. United States*, —— U.S. ——, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987) (contractual debt); *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983) (damages for infringement of patent). Money today is simply not a full substitute for the same sum that should have been paid some time ago. Prejudgment interest therefore must be an ordinary part of any award of back pay (or other incurred expense) under § 1981.

■ "Ordinary" does not imply inevitable. *Devex* allowed that an award might be inappropriate at some times. See also *Heritage Homes v. Seekonk Water District*, 648 F.2d 761, 764 (1st Cir.1981) (the only other appellate case dealing with prejudgment interest under § 1981), vacated

on other grounds, 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76, reaffirmed, 670 F.2d 1 (1982). Substantial, unexplained delay in filing suit might be such a reason, because delay shifts the investment risk to the defendant, allowing the plaintiff to recover interest without bearing the corresponding risk. Williamson, though, filed this suit in 1978. The size of the jury's verdict may be another, if only the supposition that the jury has compensated plaintiff for the time value of money can explain the result. This verdict is not so large; it does not seem to cover even actual loss.

There is one other reason why prejudgment interest may be denied—because "the amount of backpay is not readily determinable." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984). Interest is not available on lost future wages and pensions; the time value of money is taken into account when these are discounted to present value. Only back pay and expenses incurred in the past may be augmented by prejudgment interest. Yet Williamson proposed a verdict form that lumped past and future wages together. The judge used the form Williamson proposed, and the jury returned a verdict that does not distinguish past and future sources of loss. The district judge did not rely on this when denying Williamson's motion, but we must consider the implications of the general award of damages.

There are at least four ways to deal with the verdict's aggregation of past and future injury. One is to deny prejudgment interest on the ground that Williamson has made the "amount of backpay not readily determinable." A second, which Williamson proposes, is to treat the amount of back pay she computed ($127,000) as the amount the jury awarded, leaving the rest ($3,000) as the award for future loss. A third, the mirror image, would be to subtract the amount Williamson claimed for future loss (roughly $54,000 for pay and $24,000 for the reduction in the value of the pension) from the award of $130,000, leaving $52,000 as the amount of back pay. Still a fourth method would be to divide the amount of back pay Williamson sought ($127,000) by the total award she requested (roughly $205,000), producing a quotient of 0.62 as the portion of the request representing back pay. Sixty-two percent of $130,000 is about $80,500.

Williamson did not ask for prejudgment interest until after the verdict had been returned, but this is not dispositive. Fed.R.Civ.P. 54(c) provides in part: "Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which a party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Rule 54(c) was designed to divorce the decision what relief to award from the pleadings and arguments of counsel; the court is to determine, and award, the right relief in each case even if the complaint is silent on the question. The question is not whether Williamson was tardy but whether the computation is impossible or hopelessly speculative.

The third method of dealing with the verdict suggests that the jury awarded at least $52,000 in back pay. That amount appears to be "readily determinable". The second method, on the other hand, is far too favorable to Williamson. It resolves all doubt in her favor (just as the third method resolves all doubt against her). Williamson's own verdict form produced the difficulty, so doubt should be resolved in favor of Handy Button. The hard choice is between the third and the fourth methods. The fourth is most likely to be accurate over the run of cases, but the third will induce litigants to take more care in proposing instructions to the jury. Neither method can be said to be "wrong", which means that the choice rests within the discretion of the district court. See *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 831 (7th Cir.1985); *Wisconsin Real Estate Investment Trust v. Weinstein*, 781 F.2d 589, 597–98 (7th Cir.1986). The district court should exercise that discretion on remand. Moreover, because the district judge denied the request for interest without deciding whether an amount of back pay was reasonably ascertainable, it may

be that something in the record casts additional light on the subject. We do not tie the district judge's hands. If some fact or consideration the parties have not drawn to our attention makes the ascertainment of the portion of the award representing back pay too complex, the district court may choose to award none.

One could say that unless the amount of back pay is *exactly* determinable no interest should be awarded. That rule appears in contract cases, where common law courts disallowed prejudgment interest on disputed contract damages unless the sum in question had been liquidated or been made certain in another way. *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370–71 (7th Cir.1985), collects both cases and secondary sources. The award of back pay under Title VII is an "equitable" rather than a "legal" remedy, however, and the common law requirement of certainty has never been applied to it. If it were, it would be impossible to award interest even if the jury had returned separate verdicts in this case on back pay, front pay, and the value of the pension. Williamson was out of work for a decade; how much of the back pay should be apportioned to each year? Without an answer to that question, it is impossible to compute prejudgment interest, which is higher on the salary lost in 1977 than the salary lost in 1982. Absolute certainty is unavailable no matter what kind of instruction is given to the jury; it is also unnecessary. No purpose would be served by allowing the wrongdoer to keep the entire time value of the money, just because the exact amount is subject to fair dispute. Once we know that back pay is at least some minimum, it is safe to award interest on that amount.

It is also significant that the district judge did not deny interest on the ground that it was too hard to figure out what the jury had awarded as back pay. The judge gave a different reason: that the jury had awarded too much money. That reason is reviewable and wrong. Had the district judge given the reason Handy Button advances, we might be inclined to defer to it;

but he did not, and we hesitate to affirm a judgment on a ground that was neither offered to the district judge nor adopted by him. Handy Button's briefs in this court do not maintain that it is too hard to determine what the jury awarded as back pay; Handy Button instead supported the district court's rationale and added the thought that interest should be discretionary. A court should not decide a civil case on the basis of an argument made in neither the district court nor the court of appeals.

If the district judge determines that it is possible to ascertain a minimum amount of back pay awarded, it will be necessary to apportion that sum. Each year's pay requires a different amount of prejudgment interest. The computational process, however, is the same in principle as the one used to discount future income (which occurs at different times in the future) to present value. The parties should be able to agree on this mechanical computation if the district court can determine how much back pay the jury awarded, allocate it among years, and fix the rate of prejudgment interest.

The jury's verdict of $250,000 is affirmed to the extent it is challenged by Handy Button's appeal, No. 86–2019. The judge's disposition of the claim of sex discrimination under Title VII, one subject of appeal No. 86–2049, is affirmed. The denial of prejudgment interest, the other subject of appeal No. 86–2049, is reversed, and the case is remanded for further proceedings consistent with this opinion. Williamson shall recover her costs in both appeals. Circuit Rule 36 shall not apply on remand.