Donnie M. WILSON, Plaintiff–
Appellant,

v.

CHRYSLER CORPORATION,
Defendant–Appellee.

No. 98–1833.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 15, 1998.

Decided March 31, 1999.

Amy L. Silvestri (argued), Granneman & Sylvestri, Rockford, IL, for Plaintiff-Appellant.

Stephen E. Balogh, III (argued), Williams & McCarthy, Rockford, IL, for Defendant-Appellant.

Dori K. Bernstein (argued), E.E.O.C. , Office of General Counsel, Washington, DC, for Amicus Curiae.

Before HARLINGTON WOOD, JR., CUDAHY, and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Donnie Wilson worked on the assembly line at Chrysler's Belvidere plant from 1970 until 1992 when Chrysler refused to reinstate her after a medical leave of absence. The proffered reason for the refusal was that Wilson suffered from paranoid schizophrenia and was therefore totally and permanently disabled. Wilson sued under Title VII alleging that she had been sexually harassed during the course of her employment and that Chrysler had discharged her in retaliation for complaining about the harassment. Chrysler successfully moved for partial summary judgment on the retaliation claim invoking the doctrine of judicial estoppel. The district court held that since Wilson had applied for and was receiving social security disability benefits as well as a Chrysler disability retirement pension, she was estopped from arguing for Title VII purposes that she had been medically fit to resume her job at Chrysler. Subsequently, the parties filed cross-motions for summary judgment on the remaining claim of sexual harassment. Finding that Wilson had failed to come forward with evidence from which a reasonable jury could conclude that Chrysler was liable for any alleged harassment, the district court entered judgment in favor of Chrysler. We agree with the district court that Wilson's position before the Social Security Administration was inconsistent with her subsequent allegations of constructive discharge and that she is therefore estopped from claiming retaliation. But because we find that Wilson has raised a genuine issue as to whether Chrysler subjected her to a hostile work environment, we reverse the district court's dismissal of her sexual harassment claim.

I. *Standard of Review*

We review the district court's decision to grant summary judgment *de novo, see Nowak v. St. Rita High School,* 142 F.3d 999, 1002 (7th Cir.1998), applying the same criteria as the district court. *See Rodriguez v. City of Chicago,* 156 F.3d 771, 775 (7th Cir.1998). We view the record and all reasonable inferences from it in the light most favorable to Wilson, the non-movant. *See Senner v. Northcentral Technical College,* 113 F.3d 750, 754 (7th Cir.1997). To defeat summary judgment, she must set forth specific facts showing that there is a genuine issue for trial. See Fed.R.Civ.P. 56(c); *Larimer v. Dayton Hudson Corp.,* 137 F.3d 497, 500 (7th Cir.1998).

II. *Retaliation*

In June 1991, Wilson took a medical leave of absence from Chrysler. Her physician, Dr. Nicholson, diagnosed severe fatigue syndrome and recommended release from work until April 1992. At that time, Nicholson and Wilson's social worker, Forest Price, determined that she was able to return to work. However, Wilson was also examined by a Chrysler physician, Dr. Vitek, who opined that she was suffering from paranoid schizophrenia and that she

was not fit for reinstatement. Vitek sought an independent opinion from a psychiatrist, Dr. Glenn, who confirmed Vitek's diagnosis. Meanwhile, sometime in late 1991 or early 1992, Wilson had applied for social security disability benefits on the advice of a union benefits representative. In due course, the Social Security Administration (SSA) determined that she was eligible to receive benefits.[1] According to Wilson her application was half-hearted at best: she stated on the benefits application form that she did not consider herself disabled; she subsequently asked the SSA to reverse its determination in her favor; and at one stage she even tried to return benefits received. However, she concedes that at all relevant times she has continued to accept social security disability benefits. Moreover, in December 1992, she secured a Chrysler disability pension relying on the diagnosis of Vitek and Glenn.

■ Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act. *See* 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation Wilson must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there is a causal link between the protected activity and the adverse action. *See Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 397 (7th Cir.1998) (quoting *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1309 (7th Cir.1997)). It is undisputed that Wilson filed a sexual harassment charge and that Chrysler subsequently refused to reinstate her. The third element of Wilson's *prima facie* case (causal link) is disputed and dovetails with the issue of pretext. Under the burden-shifting method established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny, Chrysler must articulate a non-discriminatory reason for its failure to reinstate; the burden then shifts back to Wilson to show that the proffered reason was a pretext for discrimination.

■ Chrysler contends that it did not allow Wilson to return to work because she suffered from paranoid schizophrenia which rendered her permanently and totally disabled. The issue on appeal is whether Wilson has raised a genuine issue whether she was fit and able to work and was therefore constructively discharged. Wilson characterizes Chrysler's disability determination as a pretext for retaliation. But herein lies the rub for Wilson—how can she square her contention that she was fit and able to return to work with her prior claim of disability before the SSA? The district court could not reconcile these two apparently conflicting positions and reasoned that Wilson was estopped from pursuing her present line of argument. Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts from later reversing that position to her advantage. The doctrine is equitable and is "intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir.1992). Thus, we accept as probative and presumptively dispositive a party's prevailing position in previous litigation or quasi-judicial proceedings. *See DeGuiseppe v. Village of Bellwood*, 68 F.3d 187 (7th Cir. 1995).

■ However, we must be careful to distinguish cases under the Americans With Disabilities Act (ADA), *see* 42 U.S.C. § 12101 *et seq.*, which deal with similar but not identical issues. For we have recognized that the grant of disability benefits by the SSA is *not* necessarily dispositive of the issue whether an individual is qualified to work.[2] A benefits recipient may sue

---

1. The SSA initially denied her application but reversed that determination when Wilson filed a request for reconsideration in June 1992.

2. An individual is "disabled" for purposes of the Social Security Act if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physi-

her employer under the ADA notwithstanding the need to demonstrate that she is qualified to work. *See Weigel v. Target Stores*, 122 F.3d 461, 466 (7th Cir.1997) ("While it might seem incongruous at first blush that someone deemed 'totally disabled' by the Social Security Administration (SSA) might nevertheless be deemed a 'qualified individual' under the ADA, the incongruity is entirely illusory because the terms 'totally disabled' and 'qualified individual with a disability' are terms of art that must be understood within their respective statutory contexts.").[3] There are persuasive justifications for the distinction: whereas the ADA requires an individualized inquiry into the ability of the employee to perform a particular job, the SSA makes general presumptions about the employee's ability to work; the SSA does not consider whether the employee could work if provided with reasonable accommodation—an important element of the ADA inquiry; the ADA and the SSA may speak to ability to work at different times; and the SSA may award disability benefits on a finding that the individual meets the criteria for a listed impairment, without inquiring into her ability to find work within the economy. *See Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 603 (7th Cir.1998); *McCreary v. Libbey-Ow-*

*ens–Ford Co.*, 132 F.3d 1159, 1164 (7th Cir.1997); *Weigel*, 122 F.3d at 466–67.[4]

In the present case, there is no comparable divergence between the SSA's inquiry into Wilson's disability and our examination of her constructive discharge claim. The inquiry posed by the SSA was whether Wilson suffered from paranoid schizophrenia—a listed impairment under the Social Security Act, *see* 20 C.F.R. Part 404, Subpart P, App.1, § 12.03 (1998). And in testing the veracity of Chrysler's proffered reason for its refusal to reinstate, we ask the same essential question. Since the issue here is whether Wilson can make conflicting representations about whether or not she has the relevant impairment—paranoid schizophrenia—we need not wrestle with the further issue of whether, and if so to what extent, the impairment is disabling.[5]

■ On this decisive issue—whether she has the relevant impairment—Wilson's position has been anything but consistent. The medical opinions of Vitek and Glenn are the common thread that unravels this inconsistency. Wilson concedes that the diagnosis of paranoid schizophrenia rendered automatic the SSA's determination of total disability. Similarly, it formed the basis for Chrysler's determination that she was totally and permanently disabled and

---

cal or mental impairment ..." 42 U.S.C. § 423(d)(1)(A).

3. In a case currently under review by the Supreme Court, the Fifth Circuit held that the application for or the receipt of social security disability benefits creates a rebuttable presumption that the claimant or recipient is judicially estopped from bringing an ADA claim. *See Cleveland v. Policy Management Systems Corp.*, 120 F.3d 513, 516–17 (5th Cir.1997), *cert. granted in part*, —— U.S. ——, 119 S.Ct. 39, 142 L.Ed.2d 30 (1998). *See also McNemar v. The Disney Store, Inc.*, 91 F.3d 610, 617–18 (3d Cir.1996) (plaintiff was estopped from arguing that he was qualified to work under the ADA); *Blanton v. Inco Alloys Int'l, Inc.*, 108 F.3d 104, 109–10, *supp'd on reh'g*, 123 F.3d 916 (6th Cir.1997) (plaintiff was not estopped where his prior position was not successful); *Aldrich v. The Boeing Co.*, 146 F.3d 1265, 1268–69 (10th Cir.1998)

(plaintiff was not estopped from contending in ADA lawsuit that he could have worked with reasonable accommodation).

4. We believe that for present purposes our statement of this circuit's law of judicial estoppel as applied to ADA claims is adequate. The concurrence presents a somewhat more nuanced version of current law together with recommendations for its possible improvement. These points are helpful in achieving an overall understanding of this complex problem but we think it unnecessary to deal with them at this juncture.

We add that, of course, difficult questions of application of judicial estoppel are not necessarily limited to ADA claims.

5. The concurrence elaborates persuasively on why paranoid schizophrenia would render Wilson not qualified for employment at Chrysler.

therefore unfit to resume her post. Wilson asked the SSA to grant her disability benefits on the strength of Vitek's and Glenn's diagnosis; yet she asks us now to disregard that same diagnosis in order to find Chrysler liable for constructive discharge. It is precisely this practice of "playing fast and loose with the courts" that the doctrine of judicial estoppel was developed to curb. *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990) (internal quotation and citation omitted).

Wilson's chameleonic approach is reminiscent of *DeGuiseppe*. We held there that a police officer who was receiving disability pension benefits was estopped from claiming that he had been discharged in retaliation for exercising his First Amendment rights. At a pension board hearing, DeGuiseppe had testified that he was disabled and had submitted the reports of two physicians in support of his claim while omitting the more favorable diagnosis of his own physician. We determined that DeGuiseppe's stance was inconsistent with his subsequent claim of retaliatory discharge and in so holding we rejected his plea that he had been forced to seek and accept disability benefits as a means of self-preservation. *See* 68 F.3d at 191–92.

Wilson argues that her case is different because, unlike DeGuiseppe, she engaged the system in good faith. She points out that she has consistently maintained that she is not disabled; that she asked the SSA to reverse its determination; and that she attempted to return benefits received. This argument can be construed in two ways. Wilson may be implying that the SSA somehow forced her to accept financial assistance against her will—a suggestion so implausible that it merits no further comment. On the other hand, Wilson may be suggesting simply that she was naive rather than manipulative. Even so, we fail to see how the equities can fall in her favor. Wilson voluntarily applied for disability benefits and has been reaping the rewards ever since. She could have taken effective steps to distance herself from the process—by formally withdrawing her application or resorting to the pragmatic shortcut of refusing to cash her disability checks—but chose not to do so. And although she claims she was left with no choice but to seek assistance from the SSA, she has not presented any basis for believing that she faced "the Hobson's choice of disability or poverty." *DeGuiseppe*, 68 F.3d at 192.

The logical extension of Wilson's line of argument is that the acts of applying for and receiving disability benefits are mere technicalities, without legal effect. We cannot accept this position. On the contrary, we subscribe to the view that her actions—in applying for and receiving disability benefits—speak louder than her words. The bottom line is that Wilson successfully petitioned the SSA for an award of disability benefits and, having performed a *volte face*, now asserts that she was not disabled after all. Whether she truly believed the premise of her prior claim is beside the point. To take her at her word and find that she was not disabled when she sought the assistance of the SSA would lead to the inescapable conclusion that she procured disability benefits by deceit. To allow Wilson to succeed would make a mockery of the Social Security Act and undermine the integrity of our own proceedings. We do not hold that the operation of judicial estoppel is irrebuttable in these circumstances, no matter what the detailed fact pattern. Here the operation of the estoppel has simply not been rebutted. We agree with the district court on the present facts that Wilson is estopped from advancing her retaliation claim.

### III. *Hostile Work Environment*

█ Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

42 U.S.C. § 2000e–2(a)(1). Title VII is violated where sexual harassment is so "severe or pervasive" that it "alters the conditions of the victim's employment and creates an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

Wilson contends that she was continually harassed by her supervisors and co-workers at Chrysler. It is important to realize that the facts surrounding Wilson's claim are largely in dispute. But construed in Wilson's favor, the facts are essentially as follows. The alleged harassment dates back to the late 1970s when Wilson was taken off her job on the paint line and assigned to the masking deck. The official explanation for the transfer—conveyed by two male foremen—was that her breasts were leaving "titty prints" in the paint on the cars. She complained to her union steward but no action was taken. For the next few years, Wilson worked relatively undisturbed. However, when she was assigned to the sealer deck in the mid–1980s, her co-workers began a campaign of harassment that persisted for the remainder of her employment at Chrysler. Over the course of approximately eight years, Wilson endured repeated acts of harassment involving improper touching, verbal abuse and the display of offensive objects, cartoons and pictures. Wilson estimates that several employees—some acting anonymously—contributed to this miscellany of misconduct.

Several of Wilson's complaints involve the use or display of fake penises constructed from a rubber sealant used at the plant. At least twice a week, for the duration of Wilson's employment on the sealer deck, fake penises were sent down the assembly line past her work station. Wilson's pleas that her co-workers desist served only to encourage the practice. Occasionally she complained to management but most of the time she said nothing and simply threw the offensive objects away. Fake penises played a prominent role in other incidents. Sometime in the early 1980s, in the presence of four or five employees, a male co-worker whom Wilson identifies as Hector Garcia brandished a fake penis between his legs and yelled at Wilson: "Look what I got for you; bet you can't handle this." Wilson reported the incident to a foreman and to Fred Money, a Chrysler representative who was responsible for the investigation of employee complaints, but she contends that no action was taken. In September 1986, and twice again in 1991, a fake penis was left on a car in her work area.

Wilson relates two allegations of offensive touching. The first involved Ed Greg, a male inspector at the plant who would regularly stand close to her, look at her breasts and say "umm." Greg would deliberately position his hand so that it would come into contact with Wilson's breasts when she bent down. The second allegation comprises a single incident in 1990 or 1991 when a male co-worker, Robert Shaw, walked up to her and flicked his finger on her breast. Wilson also cites several humiliating exchanges involving verbal abuse. On September 26, 1986, co-worker Eddie Jackson called her "Hi, ho," meaning "whore." She complained to Money, who admonished Jackson. Also in September 1986, Wilson asserts that co-worker Frank Lewis accused her of "sucking a white boy's dick on the roof." She reported the incident to Money, supervisor Larry Daniels and personnel representative Charles Cady, and the latter subsequently spoke to Lewis. In 1991, a male co-worker commented: "I can make your pussy bloom." In 1990 or 1991, another coworker told plaintiff that white men only spoke to her because they "wanted [her] tu-tu."

More frequently, Wilson was taunted with offensive literature. She recalls an incident in the mid–1980s when a male coworker handed her a paper that pontificated on why beer is better than women. In 1984, Hector Garcia showed her a picture

of a nude woman and stated: "Too bad you don't have a body like this." Wilson brought the incident to Money's attention. On yet another occasion, a photograph of a nude man was taped to the hood of a car she was working on. On December 6, 1989, Wilson found an offensive cartoon taped to her work station.[6] Embarrassed and offended, Wilson reported the matter to her union steward. On four further occasions between 1989 and 1991, sexually explicit cartoons were handed to Wilson or displayed in her work area.[7] Finally, in June 1991, while on medical leave, Wilson received a lewd greeting card which had been signed by approximately 38 Chrysler employees including a supervisor, Jerry Duncan, and three foremen.[8] Wilson went to the personnel department to complain but contends that the representative with whom she spoke refused to take the card or investigate the matter.

In 1984, Chrysler adopted standards of conduct prohibiting sexual harassment. These standards were augmented by a 1987 policy statement which included a commitment to fully investigate and respond to complaints in a prompt and confidential manner. Wilson contends that at various times she reported instances of harassment to several of her superiors, including Money, Cady, Daniels and Brad Adams, her immediate supervisor. She suggests that her grievances were ignored, that she was actively dissuaded from complaining and that voicing complaints tended to exacerbate her predicament.[9] In his deposition, Money testified that in the normal course of events he would investigate co-worker harassment and make recommendations regarding appropriate disciplinary or remedial action. But while he acknowledged receiving some complaints—reports from Wilson about specific incidents in the mid-1980s as well as general reports about fake penises being placed on the assembly line—with the exception of the "Hi, ho" incident, Money could not recall whether any investigative steps were taken. Cady testified that he had investigated at least one complaint by Wilson but could not remember any details. He also recalled one complaint about fake penises on the assembly line. Adams denied receiving any complaints of sexual harassment. On a related note, the record indicates that Chrysler received some complaints *about* Wilson. On February 3, 1984 and again on October 2, 1986, Wilson was admonished for verbally abusing co-workers and supervisors in retaliation for alleged harassment. In November 1989, two female co-workers accused her of instigating a disturbance and suggested to management that she needed psychological care.

■■■ The district court dismissed Wilson's claim on the basis that she had failed to present sufficient evidence that Chrysler was liable for the alleged harassment. An employer is vicariously liable for a hostile environment created by a supervisor "subject to certain defenses." *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998) (citing *Faragher*, 118 S.Ct. at 2292–93; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998)). Liability for co-worker harassment requires a showing of negligence on the part of the employer. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431–32 (7th Cir.1995). Thus, a plaintiff must show that her employer failed to take reasonable steps to discover and remedy the harassment. *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.1997).

■■■ Allegations of supervisor harassment are limited to the greeting card of June 1991—the 38 signatures on the card include those of one supervisor

---

6. *See* Appellant's Br. at A–32.

7. *See* Appellant's Br. at A–41 to A–43, & A–45.

8. *See* Appellant's Br. at A–44.

9. In her deposition, Wilson suggested that several of her complaints provoked retaliatory responses, including tampering with her car.

and three foremen. This incident alone is hardly sufficient to trigger a heightened duty of care. Rather, the lion's share of misconduct in this case has been laid at the door of Wilson's co-workers. In deciding that Chrysler could not be found liable for such misconduct, the district court reasoned:

> Since 1984, defendant has had standards of conduct which prohibit harassment of any kind. The undisputed facts are that defendant was aware of sexually harassing conduct in 1984 and in 1986 and on at least two' occasions spoke to the purported harassers. Plaintiff has not presented evidence that defendant was on notice regarding sexual harassment occurring after 1986 other than a greeting card signed by several employees she received while on sick leave in 1991. Specifically, plaintiff does not claim to have even reported any of the conduct in 1991, other than the card. Plaintiff reported a cartoon in 1990 to her union steward, but there is no allegation nor evidence he reported it to defendant.

*Wilson v. Chrysler Motors Corp.*, 1998 WL 83098, *5 (N.D.Ill. Feb. 25, 1998). In the view of the district court, Wilson's complaint about the greeting card was "an example of too little, too late" and did not constitute notice of a hostile work environment. *Id.* at 26.

We believe that the district court's analysis of the record was incomplete. The central finding below was that Chrysler was not on notice of any acts of harassment after 1986, other than the greeting card. Yet the underlying premise—that Wilson failed to report any incidents of harassment during this time—is contested. The parties disagree as to the frequency of Wilson's complaints to management and the nature of Chrysler's response. Reading the facts in the light most favorable to Wilson, a reasonable jury might infer that some misconduct was reported to Chrysler during this period.

More significant, however, is the district court's failure to consider the possibility that Chrysler had constructive notice of the harassment. We have previously recognized that notice may be presumed where the work environment is permeated with pervasive harassment. *See Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997); *Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1018–19 (7th Cir. 1996). We note that virtually all of the disparate acts of harassment of which Wilson complains took place on the floor of the assembly plant which, by design, is a peculiarly communal employment forum. The cartoons and fake penises were displayed in common areas or placed in open view at Wilson's work station. Many of the individual incidents involving verbal abuse or sexually explicit gestures took place in the presence of other employees. It is fair to say that much of the alleged misconduct was public and deliberately exhibitionist. In these circumstances, it is reasonable to conclude that Chrysler had knowledge of at least some acts of harassment. To hold otherwise, we must believe that every member of Chrysler's management team was oblivious to such openly hostile behavior. Thus, there is sufficient evidence that Chrysler should have known about the alleged harassment. *See Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir.1989).

Assuming that Chrysler was on notice, we must consider whether it took adequate steps to investigate and remedy the harassment. Chrysler finds itself in a Catch–22: having denied knowledge or notice, it cannot plausibly argue adequate response. Accordingly, it neither suggests that it conducted investigations, disciplined employees and took remedial action nor otherwise defends its lack of action. Chrysler concedes that it received reports of harassment in 1984 and in 1986 but—contrary to the apparent view of the district court—the fact that management admonished two employees for verbal abuse falls far short of an adequate response. Since the record supports an inference that Chrysler failed in its legal duty to

respond to the harassment, we believe that Wilson has raised a genuine issue as to Chrysler's liability.

 Because the district court held that Chrysler could not be liable, it did not reach the further issue whether Wilson had been subjected to a hostile or abusive work environment. In order to prevail, Wilson must show that her work environment was both subjectively and objectively hostile or abusive. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Since Wilson clearly believed that her work environment was hostile, we focus on the objective test which is measured by a reasonable person's perception of the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367; *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 534 (7th Cir.1993). The criterion is not what a reasonable employee is capable of enduring but whether the offensive acts alter the conditions of employment. *See Dey v. Colt Constr'n & Dev. Co.*, 28 F.3d 1446, 1455 (7th Cir.1994) (internal quotation and citation omitted).

As a preliminary matter, Chrysler points out that the bulk of the alleged harassment falls outside the statute of limitations. Wilson filed her EEOC charge on December 9, 1991, which would put all conduct arising before February 12, 1991, beyond the reach of Title VII's 300 day limitations period. Several individual incidents come within the limitations period: the cartoons taped to Wilson's work station on April 12, May 23 and June 14, 1991; the fake penises placed on cars in her work area on June 13 and 14, 1991; and the greeting card received in June 1991. In addition, the habitual acts of harassment—notably the sending of fake penises down the assembly line and Greg's touching of her breasts—allegedly oc-

curred throughout this time. Thus, even within this reduced time frame, Wilson presents a substantial chronicle of misconduct.

 In any event, a plaintiff may obtain relief for time-barred acts by linking them to acts that are within the limitations period. *See Selan v. Kiley*, 969 F.2d 560, 564–65 (7th Cir.1992). Under the continuing violation doctrine, a consistent pattern of harassment is treated as "one continuous act that ends within the limitations period." *Id.* at 564. The rationale is that it would be unreasonable to require the plaintiff to sue separately where it is the cumulative effect of a series of violations that renders her working conditions intolerable. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989). Nevertheless, the plaintiff must sue "as soon as the harassment becomes sufficiently palpable that a reasonable person would realize she had a substantial claim under Title VII." *Galloway v. General Motors Serv. Parts Oper.*, 78 F.3d 1164, 1166 (7th Cir.1996). In the present case, it is doubtful whether the isolated incidents which Wilson cites in 1984 and 1986 can be linked to the later misconduct. However, the record indicates that the harassment escalated in 1989 and intensified further in the months immediately preceding the limitations period. Given the frequency and repetitious nature of the acts in question, it is reasonable to infer a consistent pattern of harassment embracing most of this conduct. The issue then becomes whether Wilson should have realized that she had a claim long before she filed her EEOC charge in December 1991. We are inclined to agree with Chrysler that Wilson should have pressed her case sooner—although perhaps only by a couple of months. In any event, it is not necessary to draw a bright line determining exactly when a cognizable claim emerged. For present purposes, it is enough to conclude that, at the very least, Wilson can reach back several months beyond the limitations period.

Reading the record in the light most favorable to Wilson, we have little difficulty in concluding that the threshold of a hostile work environment has been crossed. Wilson's case is unusual insofar as she implicates not one or even a few, but a number of alleged harassers at Chrysler. We need not speculate on whether this diffusion of responsibility was an aggravating or mitigating factor—arguments can be constructed either way. We recognize that, standing alone, some of the alleged incidents and practices appear relatively trivial. But the cumulative effect of these disparate acts defies Chrysler's contention that, at worst, Wilson was the victim of a series of isolated incidents. The multifaceted nature of the harassment, its frequent and at times routine character, and the participation of so many members of the workforce, suggest that Wilson's work environment was objectively hostile or abusive. In short, Wilson depicts a workplace in which harassment rises almost to the level of an institutional norm. Her work environment was surely one paradigmatic scenario the Supreme Court had in mind when it coined the phrase "hostile work environment."

Whether Wilson is entitled to any relief is another matter. Since Wilson's claim arose before the Civil Rights Act of 1991, equitable relief such as back pay is the only available form of redress. Wilson has now definitively lost her claim for reinstatement. Absent the possibility of damages, claims of sexual harassment prior to discharge are not actionable. *See Bohen v. City of East Chicago*, 799 F.2d 1180, 1184 (7th Cir.1986) for a pre–1991 articulation. At least at first glance, this may be fatal to Wilson's claim under Title VII. What saves the claim, if barely, is the possibility that the harassment contributed to the disability, and thus the discharge. *See Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1294 (7th Cir.1987). During the period of Wilson's medical leave of absence from Chrysler and prior to her discharge, she received disability benefits. At oral argument, counsel for Chrysler represented that these benefits were less than Wilson's normal salary. The difference between the benefits and the salary could in principle be awarded as back pay.

Finally, we note that the sexual harassment claim came before the district court on cross-motions for summary judgment. With cross-motions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made. *See Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998); *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456 (7th Cir.1997). While Wilson has raised genuine issues that defeat Chrysler's motion for summary judgment, it does not follow that she is entitled to summary judgment on the basis of her own motion. We have noted that many of the facts are contested. Moreover, Wilson relies for the most part on her own testimony which is at times confusing and inconsistent.[10] Reading the record in the light most favorable to Chrysler, the evidence is insufficiently conclusive to justify granting summary judgment in Wilson's favor. The record supports an inference that Chrysler subjected Wilson to a hostile work environment. But this is just one possible inference and we recognize that a jury might reach a different conclusion. Accordingly, we reverse the district court's grant of Chrysler's motion for summary judgment but we affirm its denial of Wilson's summary judgment motion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

EASTERBROOK, Circuit Judge, concurring.

I am not as sure as my colleagues that "persuasive justifications" (172 F.3d at

---

10. Wilson provides independent support for at least some of her allegations in the form of the affidavit testimony of Nathaniel Fort, a former Chrysler employee. *See* Appellant's Br. at A–29. Fort worked on the sealer deck with Wilson in the 1980s and corroborates acts of misconduct directed at Wilson and futile attempts on her part to complain.

505) support this circuit's rule that receipt of Social Security disability benefits is compatible with a claim under the Americans with Disabilities Act seeking an accommodation, but incompatible with other claims that are tenable only if the plaintiff is fit to work. Compare *Weigel v. Target Stores*, 122 F.3d 461 (7th Cir.1997); *McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159 (7th Cir.1997); *Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591 (7th Cir.1998); and *Flowers v. Komatsu Mining Systems, Inc.*, 165 F.3d 554 (7th Cir.1999), with *DeGuiseppe v. Bellwood*, 68 F.3d 187 (7th Cir.1995). I am not disposed to upset the current status of circuit law, for the Supreme Court will have its say soon enough. *Cleveland v. Policy Management Systems Corp.*, 120 F.3d 513 (5th Cir.1997), cert. granted, —— U.S. ——, 119 S.Ct. 39, 142 L.Ed.2d 30 (1998) (argued Feb. 24, 1999). But I would not go out of my way to endorse that status. Wilson loses under this circuit's law, for reasons given in the court's opinion, which I join except to the extent of the reservations expressed here.

An applicant for Social Security disability benefits could say that he is disabled in law even though not disabled in fact. Disability benefits are awarded to persons with certain conditions (such as blindness) or a combination of conditions and age (for example, illiterate and over 50, coupled with medical inability to do more than sedentary work). The economy may contain a few thousand jobs such persons can do, but the federal bureaucracy deems the effort to identify *which* of these people could work sufficiently unpromising that it awards benefits to all. A person who applies for and receives benefits on this categorical basis claims that he is disabled in a legal sense only. If an illiterate person over 50 with a back problem locates a job he can perform, the employer can't say "no" on the basis of the back problem; that would violate the ADA, and not simply because the ADA requires employers to make accommodations. My hypothetical person would be able to work even without an accommodation. So this person would be entitled to relief if a private employer said something along the lines of "we don't hire people with back problems." Similarly, some people are able by exceptional effort to rise above their disabilities even though the Social Security Administration thinks that most similar persons are unable to work. Again the ADA would protect such a person who located a job, notwithstanding earlier receipt of disability benefits.

But an applicant for Social Security disability benefits also might say that he is disabled in fact, suffering from a medical condition so severe that he cannot do the work an employer requires. This was the sort of application filed by the plaintiff in *Haschmann*, but we held, following the law established by *Weigel*, that Haschmann could pursue an ADA suit even though she told the Social Security Administration that she was too afflicted to show up for work.

The Solicitor General's brief in *Cleveland* distinguishes between the application for Social Security benefits and the factual representations made in the application. The application itself may be designed to take advantage of public largess that does not depend on factual inability to work and therefore does not preclude litigation under some other statute; but factual representations made in an application may defeat a claim under that other law. This seems to me a sensible resolution of a difficult problem, and if adopted it would be as applicable to a claim like Wilson's as it would be to a claim for accommodation. Some language in *McCreary*, and more in *Flowers*, nudges this circuit in that direction—though it is hard to square with more absolutist language in *Weigel*.

To decide *this* case, however, all we must do is choose between competing views of Wilson's abilities. Wilson's submission is that she is able to work and was let go only because she complained about sexual harassment by other employees.

Chrysler's is that she was let go because she was no longer able to work. Wilson's own statements and conduct enable us to choose reliably between these views.

Wilson represented to the Social Security Administration that she suffers from paranoid schizophrenia. Paranoid schizophrenia is a "listed impairment" that made a grant of disability benefits automatic, 20 C.F.R. § 220, App. 1, 12.03, but this does not imply that her disability is purely legal. Paranoid schizophrenia often entails the sort of violent outbursts (or threats of violence) that an employer need not accommodate. See *Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997). Wilson's contention that Chrysler fired her because she made a claim of sex discrimination, rather than because of inability to work, implies that Chrysler retains in its labor force paranoid schizophrenics who have *not* filed charges of sex discrimination, yet Wilson does not contend that she has found any such person on Chrysler's rolls. Moreover if, as she contends, her medical problems do not impair her ability to work, then she has opportunities elsewhere in the economy; but as far as the record reveals (and as far as Wilson's own lawyer is aware), she has not even *applied* for a job and has not done a single day's work since June 1991. This speaks volumes.

Wilson's current contention—that she applied for disability benefits only because Chrysler threatened to cut her benefits under the collective bargaining agreement—does not explain her failure to seek and obtain other work. Nor does it justify her conduct. Our legal system offers many ways to contest an employer's errors or improper demands; lying to the government to get money from the Treasury is not among them. A court therefore is entitled to assume that Wilson told the truth when obtaining disability benefits. The nature of her condition, coupled with her decision to exit the labor force, supports a grant of summary judgment for Chrysler on the retaliation theory, no matter how *Cleveland* turns out in the Supreme Court.