**Leroy SEDWICK, Jr., Plaintiff,**

v.

**Togo WEST, Secretary, United States Department of Veteran Affairs, Defendant.**

**No. IP 98–1433–C–T/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 12, 2000.

Denise Larue, Haskin Lauter Cohen & Larue, Indianapolis, IN, for plaintiff.

Tim A Baker, Assistant United States Attorney, Office of the United States Attorney, Indianapolis, IN, for defendant.

## ENTRY DISCUSSING DEFENDANT'S SUMMARY JUDGMENT MOTION

TINDER, District Judge.

The Plaintiff, Leroy Sedwick, Jr., sues the Defendant, Togo West, Secretary of the United States Department of Veteran Affairs (the "VA"), alleging that the VA discriminated against him on the basis of his race and retaliated against him for filing an EEO charge. The Defendant has moved for summary judgment. The court decides as follows.

### I.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When deciding a summary judgment motion, the court construes the evidence and draw all reasonable inferences based on the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once a properly supported summary judgment motion is made, the nonmovant must "go beyond the pleadings" and designate specific facts to support or defend each element of the claim, demonstrating a genuine issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. To avoid summary judgment, the nonmovant must "come forward with sufficient evidence supporting the claimed factual dispute." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505. A mere scintilla of evidence does not suffice to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. Not every factual dispute creates a barrier to summary judgment. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

## II. Background

The following facts are supported by proper citations to admissible evidence and are taken in the light most favorable to the Plaintiff, the non-movant, with all reasonable inferences based on the facts drawn in his favor. This presentation is limited to those facts which are material to the Defendant's summary judgment motion.

Plaintiff Leroy Sedwick, Jr., was and is employed by the VA's Indianapolis Regional Office located in the Minton Capehart Building ("Minton Capehart"). Beginning in late 1994 or early 1995, the VA undertook a major reorganization of its program and the Loan Guarantee Division (the "Division"). Certain divisions were phased out; others were consolidated; and regional sites were created in favor of individual state sites. In early 1995, VA employees, including Sedwick, were told of the pending downsizing in the Division and were given the opportunity to volunteer to be reassigned into other divisions within the VA at Minton Capehart. Sedwick declined reassignment.

As part of the reorganization, all of the loan processing and service work that had been done in Indianapolis—including all of the work that had been performed by Sedwick's section—was transferred to a VA office in Cleveland in July of 1996. Consequently, on June 25, 1996, Sedwick and three other GS–9 Loan Specialists in the Division, all African–Americans, were advised by Dennis Wyant, Director of the VA Regional Office, that they were being reassigned to other divisions effective July 1, 1996. This "reassignment" was not a directed reassignment, which is a permanent position, but was instead a detail for a specified period of time. The VA detailed Sedwick to a GS–9 Contract Representative position in the Veterans Service Division. This temporary detail did not result in any decrease in pay, benefits, or GS level, and Sedwick did not object to his assignment. Sedwick was told that his new supervisor, Ricardo Randle did not have enough time during this detail to properly train Sedwick as a Contract Representative. Thus, about half of the time Sedwick was required to perform clerical support and other duties such as collecting and distributing the mail. The other half of the time Sedwick got paid for doing nothing.

Sedwick filed an informal EEO complaint with the VA on July 19, 1996, alleging failure to promote and racial harassment.

In the Division, the GS–11 positions had more authority than the GS–9s; the GS–11s could approve certain things that the GS–9s could not. The GS–11s had single signature authority, which is a significant difference in their accountability. In addi-

tion, the GS–11s were to handle the more complicated cases if they arose. The GS–11s also were charged with reviewing the work of the GS–9s's and signing off on the work if correct.

On approximately July 21, 1996, the VA reclassified and promoted George Wolters, Caucasian, to a GS–11 Loan Specialist position in the Loan Processing Section. This promotion was based on a VA circular that gave individual offices the authority to promote their GS–9 Loan Specialists into these positions. The reclassification did not add to or otherwise change Wolters' duties because he already was performing GS–11 responsibilities and duties. In particular, Wolters had "single signature authority". Sedwick, on the other hand, was not performing such responsibilities and duties and did not have single signature authority at that time.

According to the VA circular, the Director could have granted the four GS–9 Loan Specialists single signature authority, which would have necessitated the rewrite of the position description for purposes of possible reclassification at a higher grade. The GS–9 Loan Specialists, all African American, did not receive the single signature authority, however. The decision not to grant them single signature authority was made jointly by Director Wyant and Loan Guaranty Officer Clifford Gregory.

The VA advised affected employees at the time of the phase out of the loan processing work that new duties would be coming to the Indianapolis Regional Office as part of a new Loan Portfolio Unit. The VA planned to hire up to seven people in these positions, and the GS range for these positions was GS–7/9/11. Before issuing the vacancy announcement for the new Portfolio Loan Unit, Director Wyant met with Sedwick and others and told them that they would have to competitively apply for these positions and remain in these positions for one year before being promoted to the GS–11 level. Director Wyant explained that this procedure would be utilized because the duties of the positions in the Portfolio Loan Section were new and had not previously been performed.

At the time that Sedwick pursued his EEO complaint, the only on-site EEO counselor was Carolyn Anderson, a Senior Loan Specialist, who was in his chain of command. Because he did not feel comfortable utilizing Anderson, Sedwick used Robert Lambert, who was located at the VA Medical Center, as his EEO counselor. In approximately July of 1996, Kevin Long became a second on-site EEO counselor at Minton Capehart, along with Anderson. Thereafter, on October 11, 1996, Wyant sent a memo to all employees notifying them that they should no longer use the EEO counselors at the VA Medical Center. Sedwick retained Lambert with respect to his pending EEO case, however.

On August 19, 1996, Lambert called Sedwick and asked to meet with him to review some documents concerning his EEO complaint. Lambert came to Minton Capehart and met with Sedwick, but the meeting lasted approximately one hour beyond Sedwick's normal tour of duty. Sometime after the meeting, Sedwick submitted a request for one hour of compensatory time off for the meeting. The VA denied Sedwick's request for the stated reason that Sedwick's overtime was not requested and approved in advance as required.

On September 5, 1996, Team Leader/Coach Bobby Land asked Sedwick whether he had left work 15 minutes early the previous day before taking leave. This incident did not constitute a form of discipline.

On September 20, 1996, Dave Polikoff came to Sedwick's desk and asked Sedwick to come to his office to discuss his midyear review. During the discussion, Polikoff told Sedwick that he was being argumentative and confrontational. Polikoff did not raise his voice during this meeting, nor was there any physical touching or other altercation.

On September 23, 1996, Sedwick requested that he be allowed to attend un-

derwriters' training on September 23–24. At the time, his job typically did not involve underwriting loans. He was not allowed to attend the training session.

On October 8, 1996, Sedwick contacted EEO Counselor Lambert and filed his second informal complaint of discrimination against the VA.

After receiving an EEO report from Sedwick's EEO counselor in the fall of 1996, Director Wyant discovered that the report left out information and misquoted him. Wyant sent a memo, dated October 11, 1996, to others with whom Lambert had spoken, advising them that Lambert's report did not accurately reflect what Wyant had said. The memo stated in part: "There is the possibility that what you said has not been recorded accurately. We want to provide you the opportunity to review your comments to Mr. Lambert." (Def.'s Ex. 10.) Attached to each individual's memo were the comments that individual had made as they appeared in Lambert's report. Wyant indicated, "If you are satisfied with the report, there is no need to respond. Thank you for helping insure we have an accurate record." (*Id.*) After receiving this memo, others corrected the report so that it accurately reflected what they had told Lambert. Clifford Gregory, Michael Cade, Ricardo Randle, and Dave Polikoff all made corrections. Wyant himself provided a supplemental statement, dated October 16, 1996, so that the report accurately reflected what he had told EEO Counselor Lambert.

On October 23, 1996, Anderson received an e-mail message from Mark Jamison, a Loan Specialist in the Cleveland office to which the Indianapolis loans had been transferred. The message related that a veteran recently stated he had been referred to Old Family Mortgage by Sed-

wick. Jamison stated that over the past three months other cases were also referred by Sedwick to the same company. It is a violation of the VA's Standards of Employee Conduct for any Loan Specialist to refer veterans to a specific mortgage company. Loan Guaranty Officer Gregory subsequently initiated a formal request for an internal investigation regarding Old Family Mortgage. At the time he initiated the investigation, Gregory was aware of Sedwick's prior EEO activity.

The VA identified 10 loans closed by Old Family Mortgage for fiscal year 1996 on which early default had occurred. These cases were referred to the VA Regional Counsel, Charles Brunette, for investigation. Seven of the ten cases turned out to be cases in which Sedwick was involved, but Wyant repeatedly reassured Sedwick and his counsel that he was not the subject of any investigation. The VA Inspector General—a separate, independent arm of the VA—came to Indianapolis to discuss the matter, but did not speak with Sedwick.

Despite these assurances, Sedwick continued to feel as though he was under investigation, and even felt that his telephone calls were being taped or monitored. In response to these concerns, the VA Regional Counsel sent Sedwick a memo on June 12, 1997, stating that Sedwick was not and had not been under investigation. The memo also stated that his telephone calls were not and had not ever been recorded or monitored. The only basis for Sedwick's belief that his calls were being monitored or recorded was that his phone was making certain clicking noises and echoes and he could hang up his phone, but his line would remain lit. No adverse action has been taken against Sedwick in connection with the matter involving Old Family Mortgage.[1]

---

1. During his deposition taken on June 29, 1999, Sedwick testified unequivocally that no adverse action had been taken against him in connection with the Old Family Mortgage matter. In a subsequent affidavit, he attempts to explain away this testimony, claiming that at the time of his deposition, he

understood the term "adverse action" as meaning "formal discipline, such as termination or suspension." (Sedwick Aff. ¶ 14.) Sedwick says that "[i]n this respect, I did not receive adverse action, [but] ... the conditions of my employment have been negatively altered." (*Id.*) This conclusory statement in

On February 16, 1997, Sedwick applied for the position of Management Analyst. It was determined by VA Human Resources in Livonia, Michigan that Sedwick, along with five others, was qualified for the position. He was not selected for the position. Sedwick admitted in his deposition that he has no evidence, only belief, that his non-selection was based on his prior EEO activity.

Around the Spring of 1997, Regional Counsel Brunette was assigned to represent the VA with respect to one of Sedwick's EEO complaints. As part of his representation, Brunette investigated Sedwick for sexual harassment and intimidation based on allegations brought to Brunette's attention by Carolyn Anderson. Brunette was unable to verify any of the allegations.

In approximately July 1997, the VA selected Sedwick for the Loan Specialist position in the Portfolio Loan Unit at the GS–9 level. He remained at the GS–9 position for one year (until July 1998), at which point the VA competitively promoted him to the GS–11 level. The VA also filled the other Loan Specialist positions under this vacancy at the GS–9 level. Among those who filled the position at the GS–9 level were Julie Barrett and Kristie Brunnemer, both Caucasian. Wolters also was selected for the Loan Specialist position in the Portfolio Loan Unit at the GS–9 level. He had applied for the position because by this time his job also was being phased out and transferred to Cleveland. Although he was a GS–11 at the time, Wolters had to accept a downgrade to the GS–9 level when he took this position. He remained at a higher pay rate due to his prior status as a GS–11, however.

On September 29, 1997, the VA held a computer training class at the Medical Center. Sedwick had forgotten about the class and arrived about five to seven minutes late. This incident came on the heels of a September 4, 1997, incident in which Sedwick also was late. On this date, a 30–minute meeting of the Portfolio Loan Unit was scheduled. Sedwick arrived about 25 minutes late for the meeting. During a break at the subsequent September 29 computer training class, Wyant asked to speak with Sedwick. A brief discussion about Sedwick's tardiness ensued, and Sedwick told Wyant that he forgot about the training class. No disciplinary action was taken against Sedwick for being late to class. Sedwick believed he was singled out because he filed an EEO complaint. This is because before filing his EEO charge, he occasionally missed scheduled meetings or arrived late for scheduled meetings due to his work load, but was never counseled or "talked to" regarding his absence or tardiness.

On October 1, 1997, Loan Guaranty Officer David Polikoff notified Sedwick that he would receive a special contribution award. Sedwick received a $250 award. Three employees, two of whom were GS–9 Loan Specialists as was Sedwick, received no awards. Four GS–9 Loan Specialists received larger awards: three because they were involved in more projects, and one because she serviced, by far, the most loans per day, on average.

Sedwick's affidavit, unsupported by any specific examples, does not create a genuine issue of fact as to whether any adverse action was taken against Sedwick in connection with the Old Family Mortgage matter. *See, e.g., Drake v. Minnesota Min. & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir.1998) (explaining that affidavits submitted in opposition to a summary judgment motion must set forth specific, concrete facts; mere conclusions do not suffice to create a genuine issue for trial); *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir. 1992) ("Conclusory statements or indications of opinion or belief offered without any factual support are also insufficient to create a genuine issue of fact."). Moreover, "a party cannot create an issue of fact by submitting an affidavit whose conclusions contradict prior testimony." *Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 724 (7th Cir. 1998) (citing *Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995)). Thus, Sedwick's affidavit does not create an issue of fact as to whether he suffered an adverse action in connection with the Old Family Mortgage matter.

## III. Discussion

Because he has no direct evidence of race discrimination or retaliation, Sedwick must proceed under the burden shifting method of proof established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that method of proof, he must first demonstrate a prima facie case of discrimination or retaliation. *See, e.g., Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir.1999); *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir.1998). If he can demonstrate a prima facie case, then the Defendant must articulate a legitimate, nondiscriminatory reason for its employment action. *See Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir.1997); *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir.1996). If the defendant meets its burden, then the burden shifts back to Sedwick to demonstrate that the Defendant's reason is a pretext for discrimination or retaliation. *See Johnson*, 91 F.3d at 931. The Defendant moves for summary judgment, contending *inter alia*, that Sedwick cannot demonstrate a prima facie case of race discrimination or retaliation. It is also contended that even if Sedwick can establish a prima facie case of discrimination or retaliation, the Defendant had a legitimate nondiscriminatory reason for its actions.

To show pretext, Sedwick must establish that the Defendant's legitimate nondiscriminatory reasons for the adverse actions are "unworthy of credence, thus raising the inference that the real reason is discriminatory [or retaliatory]." *Essex v. United Parcel Serv.*, 111 F.3d 1304, 1309 (7th Cir.1997). "Pretext" means "a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995). That the Defendant may have been mistaken or made a poor business decision does not demonstrate pretext. *See id.* Rather, Sedwick must show that the Defendant did not honestly believe in its stated reason. *See, e.g., Sweeney v. West*, 149 F.3d 550, 557 (7th Cir.1998). To demonstrate pretext, a plaintiff must produce evidence that "amply" supports the claim that the employer's proffered reasons are "unworthy of credence." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir.1997).

### A. Race Discrimination Claim

■ To demonstrate a prima facie case of race discrimination, Sedwick must establish the following elements: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was meeting the VA's legitimate performance expectations, and (4) similarly situated employees not in the protected class were treated more favorably. *See Stalter v. Wal–Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir.1999). The Defendant contends that the Plaintiff cannot establish the fourth element.

The Plaintiff offers only one argument in response. He contends that the Defendant is judicially estopped from arguing that he cannot establish a prima facie case of race discrimination. This is so, the Plaintiff argues, because the Defendant's staff counsel, Brunette, stipulated in an administrative hearing that Sedwick had established a prima facie case of discrimination regarding his claims for failure to promote and his reassignment to the Veterans Services Division effective July 1, 1996.

■ The doctrine of judicial estoppel prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued earlier by that party in a legal proceeding. *See Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 790 (7th Cir.1999); *Ogden Martin Sys. v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir. 1999). "The doctrine is equitable and is 'intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories.'" *Wilson v. Chrysler Corp.*, 172 F.3d 500, 504 (7th Cir.1999).

■ None of the cases upon which the Plaintiff relies supports application of the doctrine of judicial estoppel under the circumstances of this case. *See Central States SE & SW Areas Pension Fund v. Midwest Motor Exp., Inc.,* 181 F.3d 799, 805 (7th Cir.1999) (applying doctrine where party conceded a fact in a declaratory judgment action that it disputed in subsequent litigation); *Ogden Martin,* 179 F.3d at 527 (holding judicial estoppel not applicable because party was advancing a position not clearly inconsistent with its prior position); *Wilson,* 172 F.3d 500, 504 (7th Cir.1999) (holding plaintiff was judicially estopped from claiming she was not totally disabled in an ADA case where she was receiving social security disability benefits).[2] Two of the cases—*Testerman v. EDS Tech. Prods. Corp.,* 98 F.3d 297 (7th Cir.1996), and *Plair v. E.J. Brach & Sons,* 105 F.3d 343 (7th Cir.1997)—do not address judicial estoppel at all. None of the cases involved a stipulation of law made by an agency counsel in an administrative proceeding that a plaintiff attempted to use in resisting a summary judgment motion in federal court. The court is not persuaded that the VA is a "chameleonic litigant" seeking to prevail at the administrative level and before the court on opposite theories. In the absence of any indication that application of judicial estoppel would be appropriate in this case, the court declines to apply the doctrine.

■ The court concludes that the Plaintiff has not come forward with sufficient evidence to create an issue of fact as to whether any similarly situated employees not in the protected class were treated more favorably than he. Sedwick claims that Wolters is such an employee. True, Wolters is Caucasian and, thus not in the protected class. But at the time of his reclassification and promotion to GS–11 in about July 1996, he was performing GS–11 responsibilities and duties. The reclassification of his position to GS–11 did not add to or change his duties in any way. Sedwick, on the other hand, was not performing GS–11 responsibilities or duties at the time.[3] He did not have single signature authority. Sedwick himself testified to these facts during his own deposition. In order for Sedwick's position to have been reclassified as a GS–11, he first would have needed to obtain additional authority and duties.

Sedwick claims that the Director could have upgraded his GS–9 Loan Specialist position by giving him "single signature" authority. This is beside the point. It is undisputed that the Director did not give him such authority. Sedwick also claims that he was already exercising in practice the "single signature" authority. He states that the GS–11s and 12s were merely "rubber stamping" the GS–9s' work and by the spring of 1995 no longer reviewed their work due to insufficient time. In support, Sedwick points to the testimony of Bob Land, his supervisor. Land did not testify that he merely signed off on the GS–9s's work; rather, he testified that there were certain cases he "didn't look at ... closely." (Land Dep. at 23.) He testified that these were "simple case[s] that you couldn't do anything else with it other than that and whatever you did didn't make any difference as far as the veteran

---

2. It is noted that *Wilson* was decided before the Supreme Court's decision in *Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), which held that claims for social security disability benefits and damages claims under the Americans With Disabilities Act were not inherently inconsistent.

3. Sedwick has argued that he, like Wolters, was performing GS–11 work as a GS–9. In his deposition Sedwick testified that the GS–9 Loan Specialist and GS–11 Senior Loan Rep-

resentatives had similar or equal duties. He did not expound upon this conclusory statement and it is insufficient to create a genuine issue of material fact, *see, e.g., Drake,* 134 F.3d at 887; particularly when Sedwick himself testified that Wolters was performing GS–11 duties that he was not and that Sedwick never had single signature authority, which GS–11s did. (*See* Sedwick Dep. at 77–78.) As shown by the evidence, though similar, the duties of the GS–9s and GS–11s were not equal.

is concerned and him having a debt or not having a debt, and whatever the VA—the government got the property or didn't get the property." (*Id.*) Plaintiff also points to evidence, specifically his own affidavit, that Land authorized Sedwick to use Land's signature rubber stamp on Sedwick's work product.[4]

Even assuming that the GS–9s' work was merely "rubber stamped" by the GS–11s, the GS–11s and GS–12s had additional responsibilities and duties that the GS–9s did not. The GS–11s and GS–12s had authority to approve certain things that the GS–9s could not. They actually had single signature authority, which is a significant difference in their accountability. They also were responsible for the more complicated cases if they arose. There is evidence that the GS–11s were handling portfolio loans and many of the GS–9s were not.[5]

In another effort to show that he was performing GS–11 duties, Sedwick claims that he trained James Reed, a GS–11, after he came to the Loan Service and Claims Section. Sedwick also claims that he was to assume the duties Reed was to have because Reed lacked experience in servicing loans or understanding the different programs. But there is no evidence that any of Sedwick's supervisors advised him either that he was to train Reed or that he was to assume responsibility for any duties assigned Reed. Further, that Sedwick may have trained Reed to some extent and assumed some of Reed's duties is one thing. Whether or not Sedwick was performing all the duties of a GS–11 is another.

Sedwick also claims Wolters was similarly situated but treated more favorably with respect to the selections for the GS–9 Loan Specialist positions in the new Portfolio Unit in July 1997. Sedwick complains that because of his prior status as GS–11,

Wolters was paid more and had greater seniority than he. Again, the record establishes that Wolters was not similarly situated to Sedwick. That Wolters had been classified a GS–11 prior to his selection for the GS–9 position in the new Portfolio Unit is uncontradicted. That prior classification served as the basis for his higher rate of pay and greater seniority, if any. It is also undisputed that prior to his selection as a GS–9 Loan Specialist in the new Portfolio Unit, Sedwick had never been classified as a GS–11. Thus, Wolters and Sedwick were not similarly situated.

Sedwick's evidence is insufficient to create a genuine issue of material fact as to whether any similarly situated employees not in the protected class were treated more favorably than he. Therefore, he cannot demonstrate a prima facie case of race discrimination, and the Defendant's motion for summary judgment should be GRANTED on the race discrimination claim.

## B. Retaliation Claim

■ To establish a prima facie case of retaliation, Sedwick must establish that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse employment action. *See Mathur v. Board of Trustees*, 207 F.3d 938, 941–42 (7th Cir.2000); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 746 (7th Cir.1999). The Defendant contends Sedwick's prima facie case fails on the second element. It also contends that even if Sedwick could demonstrate a prima facie case, he cannot prevail on his retaliation claim because he cannot show that the legitimate, nondiscriminatory reasons for the alleged adverse actions are pretextual.

---

**4.** It is noted that Land denied this, but of course, the court accepts Sedwick's version of events as true.

**5.** It is noted that the position description of the GS–9s was applicable both for GI and portfolio loans and the GS–9s were supposed to know how to do both and that there is evidence that Sedwick had handled some portfolio loans before the new Portfolio Unit was established.

Sedwick identifies the following as the adverse employment actions upon which he bases his retaliation claim: (1) Director Wyant's three memos—the memo of October 11 "de-authorizing" Lambert as an EEO Counselor; the memo to employees interviewed by Lambert; and the October 16 "supplement"; (2) the investigation concerning Old Family Mortgage; (3) the denial of compensatory time to Sedwick for meeting with his EEO counselor past his normal tour of duty; (4) the September 20, 1996, discussion with Polikoff in which Sedwick was accused of being argumentative and confrontational; (5) the counseling regarding his belated attendance to a computer training class on September 29, 1997; (6) denial of his application for the position of Management Analyst; (7) Brunette's investigation of Sedwick for sexual harassment and intimidation; and (8) the bonus award. Sedwick urges the court to consider all of these incidents together in deciding whether he has shown an adverse employment action. Much like the plaintiff in *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998), Sedwick contends that he was subjected to a hostile environment because of his EEO activity.

But even when considered as a whole, only the denial of Sedwick's application for the Management Analyst position possibly constitutes adverse employment action sufficient to support a Title VII retaliation claim. As the Seventh Circuit has explained:

> Title VII's 'retaliation provision' ... does not say exactly what constitutes retaliation and what doesn't, but obviously there are limits. The undoubted purpose of Title VII's prohibition against retaliation is to prevent employers from discouraging complaints or otherwise chilling the exercise of an employee's rights. A dirty look or the silent treatment might be as effective at discouraging complaints as demoting an employee ... but the question remains whether each is enough to prompt a federal case. The demotion surely is; the other examples clearly not.

*Sweeney*, 149 F.3d at 556 (citation omitted). The court continued: "Common sense and the examples used in the statute's principal section, 42 U.S.C. § 2000e–2(a), exclude instances of different treatment that have little or no effect on an employee's job." *Id.*

■■ The September 20, 1996, discussion in which Polikoff accused Sedwick of being argumentative and confrontational would amount to a retaliatory reprimand or negative evaluation, nothing more. Absent a tangible job consequence, a retaliatory reprimand or negative evaluation does not rise to the level of an adverse employment action. *See Sweeney*, 149 F.3d at 556–57. As with the plaintiff in *Sweeney*, Polikoff reprimanded Sedwick in such a way that "stop[ped] short of disciplining [him]." *Sweeney*, 149 F.3d at 557. Thus, this action does not amount to an adverse employment action. Likewise, the counseling Sedwick received from Director Wyant regarding his tardiness at the September 29th computer training class and prior meeting is but a retaliatory reprimand or negative evaluation and, therefore, is not an adverse action.

■ The same holds true for the investigation into the Old Family Mortgage matter. Even if the court were to find an issue of fact as to whether Sedwick was the subject of that investigation—and the evidence to support such a finding is sparse indeed—it is undisputed that no adverse action was taken against him in connection with that investigation. At most, the evidence establishes that the investigation made him feel targeted and uncomfortable. Because of a lack of a tangible job consequence, the investigation does not amount to an adverse action sufficient to support a Title VII retaliation claim. *See Sweeney*, 149 F.3d at 556. The same can be said about Wyant's three memos. None of them caused Sedwick to suffer a tangible job consequence. Sedwick cites no authority to establish that having the EEO Counselor of one's choice constitutes a tangible job benefit, and the

court declines to interpret the concept so expansively. Additionally, none of the memos were directed toward Sedwick.

■ As for the bonus award, it is uncontradicted that Sedwick did, in fact, receive a $250 bonus. He simply is not satisfied with the amount of his bonus; he wanted more. Not even a loss of a bonus constitutes an adverse action where the employee is not entitled to the bonus. *See Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir.1996); *see also Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir.2000) (holding employer's decision to give plaintiff a raise but not the higher raise she demanded was not an adverse action). Following *Rabinovitz* and *Miller*, that Sedwick did not receive as great a bonus as he would have liked does not constitute an adverse action because he has come forward with not even a hint of evidence to suggest he was entitled to any bonus at all.

■ The court is not persuaded that Brunette's investigation of Sedwick for sexual harassment and intimidation constitutes an adverse action sufficient to support a retaliation claim. The decision in *Ribando v. United Airlines, Inc.*, 200 F.3d 507 (7th Cir.1999), provides guidance in this regard. In that case, a coworker accused Ribando of making a derogatory or harassing sexual remark, and United Airlines responded by investigating and forming a mediation panel for a hearing. No adverse action was taken against Ribando. However, a "letter of concern" was placed in her personnel file and her supervisor asked another coworker to document her work, personal habits and any inappropriate comments she made in the workplace. Ribando sued United Airlines, alleging retaliation and hostile work environment. *Id.* at 509. Specifically, she alleged that the mediation panel and coworker's documentation created a hostile environment and the letter of concern amounted to retaliation. *Id.* at 511. The Seventh Circuit held that United's investigation and counseling of Ribando in response to the coworker's allegation of sexual harassment did not constitute hostile work environment. *Id.* In so holding, the court observed: "it seems United did what an employer should do when an employee lodges a complaint of sexual harassment against another: it investigated, documented and counseled." *Id.*

It is observed that the investigation and counseling were not the bases for Ribando's retaliation claim, but rather her hostile environment claim. But that should make no difference. As in *Ribando*, allegations of sexual harassment and intimidation against Sedwick were brought to the Defendant's attention, and Brunette conducted an investigation. Just as United's investigation into the sexual harassment complaint failed to amount to a hostile work environment in *Ribando*, the investigation into the allegations against Sedwick fail to rise to the level of an adverse action sufficient to support a retaliation claim.[6]

■ The court seriously doubts that the denial of compensatory time to Sedwick for meeting with his EEO counselor past his normal tour of duty would constitute an adverse action sufficient to support a retaliation claim. It is undisputed that the VA allowed Sedwick to meet with his EEO counselor during his normal tour of duty. This particular meeting ran past his normal tour of duty, and Sedwick has provided no authority that would require the VA to compensate him for meeting with his EEO counselor on his own time. Thus, Sedwick has not met his burden of establishing that the denial of compensatory

---

6. But even if the investigation were an adverse action, the Defendant has offered a legitimate, nondiscriminatory reason for the investigation—a veteran had stated that he had been referred to Old Family Mortgage by Sedwick and the VA Standards of Employee Conduct prohibit any Loan Specialist from referring veterans to a specific mortgage company, and Sedwick has not pointed to any evidence which would suggest that this reason is unworthy of belief.

time constituted an adverse employment action.

But even if the court is wrong, and the denial of compensatory time in this one instance amounts to an adverse action, Sedwick has not made out a retaliation claim based on that denial. The Defendant has come forward with a legitimate, nondiscriminatory explanation for the denial of compensatory time—the meeting continued past Sedwick's normal tour of duty, approval for overtime is required in advance, and Sedwick had not received approval in advance. Sedwick offers evidence that prior to filing his EEO charge he had been granted compensatory time when he unexpectedly worked past his normal tour of duty. Nonetheless, this evidence does not demonstrate that the VA's explanation is phony. Sedwick has not produced evidence that "amply" supports his claim that the VA's explanation is "unworthy of credence"; therefore, he has not shown pretext. *See Giannopoulos,* 109 F.3d at 411.

That brings the court to the only possible adverse action—Sedwick's non-selection for the Management Analyst position. However, Sedwick admitted in his deposition that he has no evidence, only his own belief, that his non-selection was based on his prior EEO activity. His unsupported belief is insufficient to create an issue of fact as to whether his non-selection for the position was in retaliation for his prior EEO activity.

The evidence is insufficient to demonstrate a prima facie case of retaliation. Even if Sedwick could demonstrate a prima facie case with respect to a few allegedly adverse actions, he has not shown that the Defendant's legitimate, non-discriminatory reasons for those actions are pretexts for retaliation. Therefore, the Defendant's motion for summary judgment should be **GRANTED** on the retaliation claim.

## IV. Conclusion

The Defendant is entitled to summary judgment on the Plaintiff's race discrimination and retaliation claims. The Defendant's motion for summary judgment will be **GRANTED** and final judgment in favor of the Defendant and against the Plaintiff will be entered.